Walter BERGMAN and James Drummond, Personal Representative of the Estate of Frances Bergman, Deceased, Plaintiffs,

v.

UNITED STATES of America; Barrett G. Kemp, individually and as a former employee of the Federal Bureau of Investigation, and Thomas J. Jenkins, individually and as a former employee of the Federal Bureau of Investigation, Defendants.

No. G 77–6.

United States District Court, W.D. Michigan, S.D.

Feb. 7, 1984.

William H. Goodman, Elizabeth Gleicher, Goodman, Eden, Millender & Bedrosian, Neal Bush, Bush, Bennett & Magid, Detroit, Mich., for plaintiffs.

R. Joseph Sher, Nicki L. Koutsis, Torts Branch, Civ. Div., Dept. of Justice, Washington, D.C., for defendants.

## OPINION ON DAMAGES

ENSLEN, District Judge.

Plaintiffs in this action under the Federal Tort Claims Act (FTCA) are Dr. Walter Bergman and the personal representative of the estate of his late wife, Frances Bergman. Both Walter and Frances Bergman were among the "freedom riders" who traveled by bus into the South in May, 1961 to test a recent pronouncement by the United States Supreme Court that the Constitution required racial equality in interstate transportation facilities. Their encounter with a conspiracy of violent racism in Alabama was described in detail by this Court in an earlier opinion. *Bergman v. United States*, 565 F.Supp. 1353 (W.D.MI. 1983). That decision followed upon trial of the United States' liability for the injuries plaintiffs suffered during their journey into Alabama.[1] I held that the federal Government was negligent in failing to take steps available to it to avoid the violence, and concluded that,

> ... the United States' failure to carry out its duties was a primary moving cause without which the physical injuries to the Freedom Riders would not have occurred. Moreover, the Plaintiffs suffered not only physical injury but also injury in the sense that they were deprived of the equal protection of the laws and their right to travel freely interstate.

565 F.Supp. at 1414.

In addition to these rather obvious injuries, Plaintiffs contend that when Walter Bergman was beaten in Anniston, he suffered an injury to one of the arteries that supply blood to the brain. At trial in October, 1983 on the bifurcated issue of damages, Plaintiffs sought to prove that such an arterial injury, though essentially asymptomatic for several months, caused Dr. Bergman to sustain serious and permanent injury to a portion of his brain when he underwent an appendectomy some four

---

1. A mistrial was granted as to individual Defendants Barrett Kemp and Thomas Jenkins at the conclusion of the liability phase, and the case was submitted against the United States solely on FTCA grounds. Four unknown agents of the FBI who were originally named in the action were dismissed by stipulation and order of the court during the damages portion of the trial.

months after the beating. The testimony presented to the Court during the five days of trial on damages focused almost exclusively on this causation question, and its resolution is the most difficult task before the Court at this final stage of the litigation against the United States.

Plaintiffs seek damages for Walter Bergman's permanently disabled condition since the operation, and for the toll that condition took on Frances Bergman during her lifetime. Plaintiffs also claim damages based on the events of the ride itself, including the beating, the fear and emotional injury they both suffered, and the Constitutional deprivations that they endured. Each plaintiff requests an award of one million dollars for these injuries, although they argue that in fact the value of their claims exceeds even that amount.[2]

In support of their damage claims, Plaintiffs presented the testimony of Walter Bergman[3] and his present wife, Patricia Bergman. Dr. George Mogill, for many years the family doctor of both Walter and Frances Bergman, also testified on their behalf. In their efforts to prove a causal connection between the beating and Bergman's brain damage, Plaintiffs relied largely on the testimony of their expert witness, Dr. John Gilroy. A specialist in neurology since 1960, Dr. Gilroy is Chief of Neurology at Harper Grace Hospital and Detroit Receiving Hospital in Detroit, consults at several other hospitals there, and is Professor and Chair of the Department of Neurology at Wayne State University. Through a deposition taken in 1983, Plaintiffs also introduced the testimony of the anesthesiologist involved in Bergman's 1961 appendectomy, Dr. Raymond Sphire.

The Government called two expert witnesses to contest Plaintiffs' theory of causation. Dr. Oscar Reinmuth has been a neurologist for some 30 years, and is now Professor and Chair of the Department of Neurology at the University of Pittsburgh. Dr. Maurice Victor's background includes a decade of teaching at Harvard University, and he has been a Professor of Neurology at Case Western Reserve University and Chair of the Department of Neurology at Cleveland Metropolitan General Hospital since about 1962.

All of the extremely well-qualified experts relied on Dr. Gilroy's report of an examination of Bergman early in 1983, and supplemented that information with medical records which were also received in evidence. Those records include extensive reports from Dr. Bergman's 1961 hospitalization, and a thorough reevaluation of Bergman's condition undertaken in 1975.[4] A number of other exhibits were also received.

█ In preparing this opinion, and weighing the sharply contrasting expert testimony, I have reviewed the entire record and considered the briefs submitted by the parties. Having done so, and having observed the witnesses and heard the evidence presented at the time of trial, I make the following findings of fact and conclusions of law, as required by Rule 52(a), Federal Rules of Civil Procedure (FRCP). I turn first to the most difficult and most controverted question of whether Dr. Bergman's brain damage was proximately caused by injuries he received in Anniston, Alabama.

---

**2.** Under the FTCA, Plaintiffs here are limited to the damages of $1 million each, requested in their administrative claim. 28 U.S.C. § 2675(b).

**3.** On the second day of the damages trial, the Government raised an objection to any testimony by Dr. Bergman regarding statements made by or transactions with his late wife. Defendant based its objection on Federal Evidence Rule 601 and the Alabama Deadman's Statute, Code of Ala.1975, § 12–21–163. The testimony was conditionally received, and after trial the Government withdrew its objection.

**4.** The Court received Grace Hospital records of Dr. Bergman's admissions in 1962, 1966, 1969, and 1975 on a conditional basis, pending a determination of the relevancy of those records. I found each admission revealed some relevant evidence, although the pertinent information in the 1962, 1966 and 1969 records was not extensive. Therefore, I now rule that Plaintiff's entire Grace Hospital record, Plaintiffs' exhibit 2, is admitted in evidence.

## I. CAUSATION

### The Beating in Anniston

On May 14, 1961 the Trailways Bus carrying Walter and Frances Bergman, and other freedom riders, stopped in Anniston, Alabama. There, Walter Bergman was beaten into unconsciousness by a group of attackers who entered the bus carrying brass knuckles and clubs. Dr. Bergman recalled being floored by blows to the head and face, but once on the floor of the bus he quickly blacked out. Other witnesses provided details of the severe beating Bergman sustained.

Schooled in nonviolence, Bergman had offered no resistance to the blows, but Isaac Reynolds testified that it "took something for them to beat him down to the floor where they began to kick and stomp him." (TR L 89).[5] Herman K. Harris testified that there were "two main guys" kicking Dr. Bergman, and that they "just kicked him and kicked, just kicked him * * Up, up his head and shoulders in the back. I thought maybe they would break his, bust his head, ..." (TR L 168). Another freedom rider, Ivor Moore, ended up on top of Bergman, and he was also kicked and stomped. According to Reynolds, the beatings lasted a total of maybe seven or eight minutes, then Bergman was picked up and thrown over several seats to the rear of the bus. At the time of the incident, Bergman was 61 years old.

When Bergman regained consciousness, he was seated, and the bus was moving on its way to Birmingham. Both of his eyes were blackened from the blows he had received, and his jaw was so sore and swollen that he had to live on a liquid diet for several days. Bergman testified that he felt he had recovered his "normal sensibilities" when he came to. (TR L 525). He does not recall feeling dizzy, and he was aware of his surroundings. Over the next few days he had no visual problems, no headaches, suffered no further loss of consciousness, and did not feel faint. (TR D 296–297). He believed his wounds needed only time to heal, and he did not seek medical attention for his injuries. (TR D 296, TR L 535).

The freedom riders, unable to continue their bus trip from Birmingham, flew to New Orleans where they stayed for a few days, participating in civil rights activities. The Bergmans then returned to Detroit, Dr. Bergman resuming work he had begun before the trip, on the grounds of their new home. Bergman testified that in April he had cleared a path up a hill from a creek on the property, and that after returning to Detroit he was taking pebbles from the creek bed and using them to cover the path he had already cleared. He testified that the work was fairly strenuous; the hill was steep enough to require five switchbacks, and Bergman was pushing the rocks up the trail in a wheelbarrow. His time that summer was divided between the work on his property and a busy schedule of civil rights activities, including speaking engagements and training events in the midwest and east.

At trial, Dr. Bergman recalled that much later his wife told him that she had noted he had been dragging one of his feet slightly since the beating. The medical records contain reports of this "foot drop" and that Bergman had been acting somewhat "hazy" and had shown some personality change during the summer. It appears that this information came largely from Frances Bergman, although in one notation, a doctor states that "this peculiar demeanor was noticed by the physicians and later confirmed by the patient's wife." (Ex. 2, p. 201). A history taken by Dr. Mogill on September 16, 1961 noted that after the beating in Anniston, Bergman "was somewhat dizzy for sometime although there was no apparent sequelae of unusual moment." (Ex. 2, p. 197). However, Bergman's present recollection is that he did not suffer any dizziness during the summer of 1961, and he testified that he

---

5. Since the trial was bifurcated, there are two separate transcripts. I refer to the transcript from the liability phase of the trial as "TR L" and to that from the damages portion of the trial as "TR D".

could not say whether he had in fact been somewhat "hazy" during the months following the beating. The secondhand reports in the medical record are the only evidence before the court of any possible sign during the summer of 1961 that the injury Bergman received in Anniston might be more serious than Bergman had at first believed.

### The Operation

On September 15, 1961, Frances Bergman contacted Dr. Mogill and told him that Bergman had diarrhea and abdominal pain. The doctor prescribed some medication, but when Bergman's symptoms were not relieved, Dr. Mogill arranged for him to be admitted to Grace Hospital in Detroit (now Harper-Grace). Dr. Bergman has no recollection of this event, but the hospital record reflects that he was admitted at 12:25 a.m. on September 16, 1961, with diarrhea and lower abdominal pain. The initial impression was acute gastroenteritis, and a possible partial bowel obstruction. However, by 4:30 p.m. on the 16th, consulting surgeons Miller and McLean concluded that an immediate appendectomy was indicated, (Ex. 2, p 213), and a post-operative report confirms that his appendix was indeed inflamed. (Ex. 2, p 222).

Dr. Bergman was given some premedications, and at 5:00 p.m. a spinal anesthetic was started. According to the anesthesiology record, the surgery began at 5:10. Toward the end of the operation, Dr. Bergman suffered a drop in blood pressure, and for some period of time between 5:50 and 6:00 p.m., his heart stopped. The length of that cardiac arrest, and its significance in light of Bergman's symptoms, are key elements to both the Plaintiffs' and the Defendant's view of the case, and are strongly contested. However, it is undisputed that although Dr. Bergman's vital signs returned, he remained in a coma for several days, and suffered severe and permanent damage to the portion of his brain that controls muscle coordination.

The hospital progress notes indicate that Bergman suffered convulsions and had problems with muscle coordination both while comatose and after he regained consciousness. Bergman testified that for fully a month after the operation, he had to be tied down when on a stretcher or in a wheelchair, because of the intensity of the shaking in his limbs, and his bed had to have sideboards to keep him from falling out. He began physical therapy on September 29, making some minimal progress. By November 11 he was able to get in and out of bed, and by December 15, he could feed himself, according to the progress notes contained in the hospital record. Bergman was discharged on December 16, 1961, with only a "guarded" prognosis for recovery of full muscle control. (Ex. 2, p. 212).

For several weeks after leaving the hospital Bergman was unable to sit up on his own, and had to be bolstered in a sitting position with pillows. His testimony recounted the lengthy and difficult process of regaining the ability to do even such simple things as clapping his hands. A diary that Frances Bergman had kept (Ex. 23) indicates that it was not until the end of April 1962, that Bergman was able to write a letter, and that it was not until late May 1964 that he was regularly able to use the bathroom without assistance. The diary reflects a daily struggle in which Bergman would slowly and painfully progress and then regress. He had shaky days with persistent tremors, and steady days when he met with some success at standing or walking for minutes at a time. Although Bergman persisted in his attempts at walking, and in fact made some progress, he was never able to walk without either the aid of another person or some artificial support. In 1975, after having already suffered several falls, he was advised not to make further attempts to walk, given the likelihood of injury. Since that time, Bergman has reamined confined to a wheelchair.

Dr. Gilroy examined Bergman in March, 1983 and found that he continues to suffer from a severe tremor in his limbs. He also has difficulty in speaking because of im-

paired articulation, a condition known as dysarthria. Dr. Bergman cannot stand or walk unaided, because of truncal ataxia, a nervous system condition in which the muscles are unable to make the minute adjustments required to balance and counteract gravity. Bergman's movements are marked by what is known as an "intention tremor": when he tries to touch an object, for example, his arm overshoots and then overcorrects until finally reaching the target, in a kind of oscillating motion.

While Dr. Bergman's coordination remained severely impaired, his mental processes appeared to be making a swift recovery within a relatively short time after the operation. The September 17, 1961 progress notes indicate that Bergman appeared to respond slightly to loud calling, and by September 21, he was responding to suggestions and trying to communicate. The progress notes from the end of September reflect that Bergman's speech was good and his thinking was clear. On October 2, it was noted that Bergman's cerebration was improving, and he was mentally alert.

Similar observations of clear mentation were made in May 1962 when Bergman was in the Rehabilitation Institute of Metropolitan Detroit, (Ex. 3, p. 24), and in 1975, by Dr. McHenry. A test administered to Bergman in 1975 indicated that he has an IQ in the superior range. Bergman recalled at trial that within a month after he regained consciousness, he was used to demonstrate to a class of medical students the sharp distinction between physical agility and mental capacity: while practically shaking off the hospital bed, he counted backwards rapidly from one hundred, by sevens.

### Plaintiffs' Theory

It is this marked contrast between Dr. Bergman's intellectual ability and his incoordination of movement that first caught the attention of Plaintiffs' expert, Dr. Gilroy. This clinical picture, combined with evidence of cardiac arrest of only short duration, caused Dr. Gilroy to theorize a causal factor with an origin outside the walls of the operating room.

An understanding of Plaintiffs' theory and the medical testimony requires first an orientation to the anatomy of the brain. Here, the testimony focused on three major anatomical divisions: the cerebrum, the cerebellum, and the brainstem. The cerebral hemispheres include the large convoluted folds of matter at the top of the brain, and are concerned with higher functioning such as thought and memory, as well as hearing and vision. A smaller area of the brain, the cerebellum, lies beneath the cerebral hemispheres toward the rear of the skull cavity. This portion of the brain controls regulation of muscles of posture and allows a person to be stable by making the automatic adjustments necessary to combat gravity. Thus when we sit or stand, we do not sway, the head does not nod; the muscles are under automatic control.

The brainstem is located in front of the cerebellum, and connects to the spinal cord. The upper portion, the pons, bridges the two cerebellar hemispheres. All of the pathways from the cerebral hemispheres and cerebellum have to go through the brainstem to reach the spinal cord. Eye movement is programmed in the brainstem, and in the lower part, called the medulla, there are senders for automatic functioning such as maintenance of blood pressure and respiratory rate.

The experts agreed that Dr. Bergman's problems with coordination of movement and speech signify severe and permanent damage to the cerebellum. They agreed that if any cerebral impairment is present, it is only mild in degree. But while they agreed that in general terms it was a deprivation of oxygen—anoxia or hypoxia—during the operation that damaged Bergman's brain, their theories diverged sharply when it came to the mechanism by which he sustained a sufficient amount of anoxia to account for his severe and permanent impairment.

The seed of the experts' dispute in this case is the report found in Bergman's medi-

cal record that the cardiac arrest was estimated to have lasted only about one minute and 45 seconds. Blood flow to the brain through its arterial systems, like all blood flow, depends on the pumping action of the heart. The cessation of blood flow caused by a cardiac arrest deprives the brain of the vital oxygen and glucose it needs to survive, and results in permanent cell damage, but only if the cardiac arrest is of at least three to five minutes duration.

The Government's experts contended that Bergman's condition can be explained by the lack of blood flow during the cardiac arrest. They argued that given Bergman's residual symptoms, the one minute, 45 second estimate must be an error. Dr. Gilroy, on the other hand, advanced the position that because Bergman's heart is reported to have resumed its beat within such a short time, the anoxia caused by that event was not enough by itself to cause the severe brain damage observed in Bergman. Dr. Gilroy found further support for this proposition in the predominantly cerebellar nature of Bergman's injury. He testified that in his experience anoxia alone, no matter how long it deprives the brain of oxygen, does not produce a clinical picture of significant cerebellar damage and nonexistent or mild cerebral damage in a brain where the circulatory system had been functioning normally. Usually, Gilroy testified, there is major involvement of the cerebral hemispheres, with clinical signs of damage to that area of the brain as marked or more marked than the indications of damage to the cerebellum. Dr. Gilroy testified that in light of these considerations, there must have been some preexisting abnormality in the brain's circulatory system that focused on the cerebellum and that was responsive not only to the cardiac arrest, but also to the period of low blood pressure which preceded it.

Dr. Gilroy testified that the selective nature of the brain damage, resulting in a predominantly cerebellar syndrome, can only be reflective of damage to the arterial system which supplies blood to that specific area of the brain. Two main circulatory systems feed the brain with oxygen and glucose. The carotid arteries are the large vessels in the front of the neck, each palpable as a strong pulse. These two arteries have their origin in the main vessels in the chest, and each divides into two branches, one going into the face, and one—the internal carotid—going up into the brain through the base of the skull. The most important branch of the internal carotid, the middle cerebral artery, nourishes about two thirds of the cerebral hemispheres. In the territory of that artery are the areas controlling speech and orientation, and most of our thought processes.

The other main system is the one that supplies the cerebellum. It is composed of two vertebral arteries that ascend close together in the back of the neck at either side of the spinal column, encased in lateral protrusions of the vertebrae called transverse processes. These arteries ultimately pass through the foramen magnum in the base of the skull and run up the medulla, joining at the base of the pons to form the basilar artery. In addition to supplying the cerebellum, this vertebral basilar system also supplies blood to the brainstem, part of the midbrain, and some of the internal structures of the brain, and often provides some supply to the occipital area of the hemispheres.

Before joining to form the basilar artery, the vertebrals give off a branch which feeds the undersurface of the cerebellum. The basilar artery also gives off several branches as it runs up the brainstem. As Dr. Gilroy explained, the vessels of two of these branches interlace in the cerebellum, creating an area referred to as the "watershed." There, blood supply is relatively poor and there is maximum damage when there is a reduction of blood flow, since blood flow tends to be least effective where there is a juncture of circulation.

Under normal circumstances, the vertebral arteries are the sole source of blood supply to the cerebellum. However, two communicating vessels connect the carotid and vertebral basilar systems in a safety feature called the Circle of Willis. While

blood from the carotid system may run backward to the base of the brain through this mechanism, it does not protect the brainstem or cerebellum. It does serve to protect the area supplied by the last branch of the basilar system, the occipital lobe. Thus, when there is a vertebral basilar problem, the entire cerebral hemispheres may be protected from damage.

Given these principles of blood flow in the brain, Dr. Gilroy looked to the vertebral basilar system to find the mechanism that produced Bergman's condition. In a report to Plaintiffs' attorneys written after his examination of Bergman in March 1983 (Ex. 24), Dr. Gilroy concluded that the mechanism involved was blockage of a vertebral artery. He opined that Bergman would have survived such an occlusion with a marginally sufficient blood flow through the second vertebral artery, and would not have experienced any symptoms until the system was stressed by a drop in blood pressure. He posited that when Bergman suffered such an episode of hypotension during the operation, the reduced efficiency in circulation of the damaged arterial system resulted in inadequate blood flow to the cerebellum, causing permanent damage, while the normal carotid system continued to supply the cerebrum. Under this theory, Dr. Gilroy concluded that the damage in the cerebellum was then compounded by the cardiac arrest, which was too short in duration to affect the cerebral hemispheres.

Dr. Gilroy theorized that the injury to the vertebral artery must have been caused by trauma at the time of the beating, since there was no other explanatory cause of

vertebral basilar insufficiency in Bergman's medical history and since Bergman had been healthy prior to going on the freedom ride. Dr. Gilroy's examination of Bergman and the medical history he took at that time had revealed no indications of vascular disease which might have explained the posited vertebral artery occlusion. Prior to May 1961, Bergman's health had been good, and he led an active life. During 1959 and 1960, the Bergmans lived in Austria, where Dr. Bergman did a considerable amount of walking on a daily basis.[6] Bergman testified that his health was excellent when he left Detroit to join the freedom rides.

At trial, Dr. Gilroy testified that although he still believed that the beating had caused an injury to Bergman's vertebral artery and that such injury had ultimately resulted in the cerebellar damage, a literature search had caused him to refine his theory. He testified that the vertebral artery injury he had postulated would not have caused damage during the period of hypotension unless the autoregulatory capability of the vertebral basilar system had been severely impaired.[7] Autoregulation refers to the ability of the brain's circulatory systems to maintain the proper blood flow despite variations in blood pressure. With impairment of autoregulation, a drop in blood pressure is accompanied by an equivalent diminution of blood flow through the arterial system. Consequently, perfusion of the brain by an arterial system with impaired autoregulation is affected at higher pressures than if autoregulation were functioning. Gilroy concluded that in this case there was, in addi-

6. Bergman did testify that while in Austria he had sought medical advice for what he referred to as "indigestion." (TR D 72a). The doctor there reportedly diagnosed pancreatic cancer, and Bergman underwent treatment which he recalled as consisting of no more than bedrest and an unpleasant diet. Bergman testified that when he returned to the United States he was no longer experiencing any pain, and his family doctor, George Mogill, ran some tests and found him to be in good health. Dr. Bergman has not had any indication of pancreatic disease since, and I conclude that this portion of his medical

history is of no importance to the determination of the issues presented here.

7. The Government objected to the incorporation of autoregulation into Plaintiffs' case at trial, on the grounds that Defendant had not been previously advised of this development in Dr. Gilroy's theory. I do not find that the Government was prejudiced by this development, in light of Dr. Reinmuth's familiarity with the subject area and in light of the additional time which was afforded the Government prior to cross-examination of Dr. Gilroy.

tion to occlusion of a vertebral artery, a loss of autoregulation in the vertebral basilar system, and that it was this combination of factors that made Bergman's cerebellum susceptible to damage during the period of hypotension. Since in his opinion a vertebral artery injury could have caused the impairment of autoregulation, he felt that the validity of his theory of causation remained intact.

The description of how the beating and vertebral artery injury could have resulted in impaired autoregulation, is somewhat complicated, and largely theoretical. Gilroy testified that one way that blood vessels accommodate changes in blood pressure is by an automatic involuntary muscular response: if the pressure drops, the vessel—essentially a tube of muscle tissue—expands to maintain the same amount of flow; if the pressure increases, the tube constricts. Dr. Gilroy's theory in this case focused on a second mechanism of autoregulation he described, in which nerve fibers on the blood vessels receive impulses and respond by contracting or relaxing. Dr. Gilroy testified that it has been proved that the nerve fibers take their origin from nerve cells in the brainstem; there, the cells respond to stimuli and send out impulses that result in regulation of the flow through the vessel. According to Gilroy, studies reported in the literature indicate that when the brainstem is damaged almost anywhere in its central pathway of core brain matter, autoregulation is impaired, because of the integral nature of the autoregulatory system there. Such impairment of autoregulation may last for many weeks or months, or as long as a year, Dr. Gilroy stated. He believes that is what happened in this case.

According to Dr. Gilroy, this scenario resulted because a blood clot from the occluded or injured vertebral artery had moved up into the brainstem and occluded a small vessel there, causing tissue death (infarction) in the area cut off from blood supply. This event could have occurred either during clot formation at the time of the trauma to the artery, or later during the normal processes of clot dissolution, but in any event within some ten days of the beating.

Dr. Gilroy testified that in his opinion, with impaired autoregulation Bergman would have gotten into trouble with a systolic blood pressure of 90 or even higher, while a normal individual would not start to feel faint until that upper pressure dropped to about 60. The medical record reflects that at approximately 5:45 p.m. during the course of the operation, Bergman's blood pressure dropped to 80/50, from a pressure of 120/80 recorded at the beginning of the operation. I find no blood pressure recorded from 5:45 until shortly after 5:55, contrary to Dr. Gilroy's testimony that at 5:50 there was a systolic pressure of 60. However, it is clear that there was a period of relative hypotension for some seven minutes prior to the cardiac arrest.

Dr. Gilroy opined that damage to the cerebellum began with the fall in pressure, because the autoregulatory system could not respond to allow a sufficient supply of blood to reach that portion of the brain. Bergman felt the effects of the variation in the cerebellum, while a separate undamaged autoregulatory system in the cerebral hemispheres was able to maintain an adequate blood flow to that portion of the brain. The cerebellum continued to sustain permanent injury during the one minute and 45 seconds of cardiac arrest. Dr. Gilroy testified that this total period of almost nine minutes was a long time in terms of brain damage, and that it was the cause of the selective and permanent damage to Bergman's cerebellum.

Gilroy testified that his theory is the only way to explain the severity of Bergman's brain damage while at the same time accounting for a short period of cardiac arrest and the predominantly cerebellar nature of Bergman's residual symptoms. He testified that because he can find no other explanation consistent with all the facts, he can state to a reasonable degree of medical certainty that Bergman suffered an injury to his vertebral artery on May 14 that

played a direct causal role in the later brain damage.

The Government, through its medical experts, took exception to Dr. Gilroy's theory at every step of the analysis. Drs. Reinmuth and Victor directly contradicted many of the medical principles upon which Dr. Gilroy relied, and disputed the reasonableness of Gilroy's conclusions, pointing to the lack of objective evidence of vertebral artery injury and brainstem damage. They rejected Gilroy's conclusion that the picture of predominantly cerebellar syndrome could not have been produced by cardiac arrest alone, and they directed the court's attention to indications in the medical record of "mild but definite" cerebral deficits. Dr. Reinmuth testified to an entirely different school of thought on autoregulation, stated that autoregulation is not controlled by a center located in the brainstem, and opined that damage to the brainstem would have to have been severe to impair autoregulation. Both Dr. Reinmuth and Dr. Victor were of the opinion that injury to a vertebral artery during the beating was highly unlikely and that if there had indeed been such an injury, it would have been accompanied by symptoms.

The Government contends that the most reasonable explanation for Bergman's condition is that the medical record inaccurately reflects the length of the period of anoxia, and that in fact Bergman must have suffered cardiac arrest for at least three to five minutes. Drs. Reinmuth and Victor believe that the cerebrum suffered the same lack of oxygen as the cerebellum during the operation, causing severe damage in a diffuse fashion. In their opinion, Bergman's concededly excellent cerebration can be attributed to a strong recovery in the cerebrum and to the great redundancy of cell function within that portion of the brain.

### Law of Causation

In order to prevail on their theory of causation, the Plaintiffs must meet the requisite legal standard of proof. Under the Federal Tort Claims Act, Alabama law controls the question of causation, since the United States' negligence occurred in that state. 28 USC § 1346(b); *Richards v. United States*, 369 U.S. 1, 10, 82 S.Ct. 585, 591, 7 L.Ed.2d 492 (1962). The Court has already ruled that the United States' negligent failure to act was the proximate cause of the beating sustained by Walter Bergman on May 14, 1961. *Bergman v. United States*, 565 F.Supp. 1353, 1414 (W.D.MI. 1983). Under Alabama law, the United States is responsible for all the reasonably foreseeable consequences of that negligent omission. *Watkins v. United States*, 589 F.2d 214, 219 (CA 5 1979). Thus, Bergman may recover for his brain damage if it is shown to be

a natural and probable consequence of the negligent act or omission which an ordinarily prudent person ought reasonably to foresee would result in injury.

*Vines v. Plantation Motor Lodge*, 336 So.2d 1338, 1339 (Ala.1976).

This rule applies equally to a contention that a second injury occurred because of a weakness or disability caused by an original injury. *Alabama Farm Bureau v. Henderson*, 374 So.2d 355, 357 (Ala.Civ. App.1979). The beating need not be the sole proximate cause in order for Defendant to be held liable for the brain injury. *Alabama Power Company v. Taylor*, 293 Ala. 484, 306 So.2d 236, 249 (1975); *Watkins v. United States, supra.* Neither must it be the act nearest in time to the injury, as long as it actively aided in producing the injury as a direct and existing cause. *Aggregate Limestone Co. v. Robison*, 276 Ala. 338, 161 So.2d 820, 822 (1964).

Dr. Gilroy readily admits that his theory is constructed not from a history of symptoms which support a diagnosis, but from a series of deductions which he contends are compelled by the facts, and which are almost entirely unsubstantiated by any direct evidence. The logic of Plaintiffs' case may be summarized as follows: the operation alone cannot satisfactorily explain the facts because the cardiac arrest lasted for only a short time and cardiac arrest alone would not cause the clinical picture Bergman

presents; in order to account for these facts, there must have been a preexisting impairment of circulation in the vertebral basilar system susceptible to a reduction in blood pressure; impaired autoregulation and inefficient circulation can result from a vertebral artery injury and brainstem infarction; and the beating could have caused a vertebral artery and a brainstem infarction. Therefore, Plaintiffs reason, it is medically *possible* that there is a causal relationship between the beating and the brain damage, and since Dr. Gilroy can conceive of no other explanation, it is more probable than not that his theory describes what in fact occurred.

Plaintiffs are not foreclosed from sustaining their burden of proof simply because the evidence on causation is circumstantial. *E.g., Southern Railway Co. v. Dickson*, 211 Ala. 481, 100 So. 665, 669 (1924); *City of Bessemer v. Clowdus*, 261 Ala. 388, 74 So.2d 259 (1954); *Folmar v. Montgomery Fair Company, Inc.*, 293 Ala. 686, 309 So.2d 818 (1975); *Plyworld, Inc. v. St. Paul Fire & Marine Insurance Co., Inc.*, 351 So.2d 1363 (Ala.1977). But their theory cannot prevail if it rests on speculation or conjecture. *Southern Railway Co. v. Dickson, supra; St. Paul Fire & Marine Insurance Co. v. Thompson*, 346 So.2d 439, 441 (Ala.Civ.App.1977). Thus it is not sufficient for the plaintiff to show only that the injury *could* have occurred in the manner alleged. *Southworth v. Shea*, 131 Ala. 419, 30 So. 774 (1901); *Maddox v. Ennis*, 274 Ala. 229, 147 So.2d 788 (1962); *Peevy v. Alabama Power Company*, 393 So.2d 971 (Ala.1981). A "mere possibility" of causation does not satisfy the requirement of proximate cause. *Brown Mechanical Contractors, Inc. v. Centennial Insurance Company*, 431 So.2d 932, 942 (Ala.1983); *Ex parte Travis*, 414 So.2d 956 (Ala.1982). At the same time,

> The plaintiffs here are not required to prove their case beyond a reasonable doubt. They need not negative entirely the possibility that the defendant's conduct was not the cause. It is generally recognized that it is enough that the plaintiff introduce evidence from which reasonable [persons] may conclude:
>
> " * * * that it is more probable that the event was caused by the defendant than that it was not. The fact of causation is incapable of mathematical proof, since no [person] can say with absolute certainty what would have occurred if the defendant had acted otherwise...." Prosser, Handbook of Law of Torts, 3rd Ed., Hornbook Series, Sec. 41, p. 245, *et seq.*

*Swanner v. United States*, 309 F.Supp. 1183, 1188 (M.D.Ala.1970).

Plaintiffs argue that their theory is consistent with the unique features of Bergman's condition and the one minute, 45 second cardiac arrest, while the Government's explanations of the facts are not satisfactory. While the ability of a theory to accommodate the total picture is often persuasive of its merit, *see, e.g., City of Bessemer v. Clowdus, supra*, the appeal of consistency will not compensate for a medical theory which is lacking. In Dr. Bergman's case, Plaintiffs' theory has a certain internal consistency and provides an explanation for what may appear to be a mystery. In its most appealing aspect, it is responsive to the sense one has on a gut level that somehow, given the proximity of events, the beating and the injury to Bergman's brain must be causally linked. Nevertheless, a thorough examination of the evidence upon which Plaintiffs' theory rests, fails to persuade me that the proofs tip in favor of Plaintiffs on this factual issue. Specifically, I am unconvinced that it is more probable than not that Bergman sustained a vertebral artery injury from the beating which was capable of seriously damaging autoregulation in the vertebral basilar system without manifesting itself until four months later.

For the reasons discussed below, I find that Plaintiffs have failed to cross the fine line between conjecture and a theory which carries a preponderance of the evidence:

> As a theory of causation, a conjecture is simply an explanation consistent with

known facts or conditions, but not deducible from them as a reasonable inference. There may be two or more plausible explanations as to how an event happened or what produced it; yet, if the evidence is without selective application to any one of them, they remain conjectures only. On the other hand, if there is evidence which points to any one theory of causation, indicating a logical sequence of cause and effect, then there is a judicial basis for such a determination, notwithstanding the existence of other plausible theories with or without support in the evidence.

*Ex parte Travis, supra,* 414 So.2d at 959, n. 3, *quoting from Southern Railway Co. v. Dickson, supra,* 100 So. at 669.

### Vertebral Artery Injury and Impairment of Autoregulation

Dr. Gilroy testified that both the medical literature and his personal experience demonstrate that a vertebral artery can be injured by the kind of trauma Bergman sustained when he was beaten in Anniston. Gilroy cited examples of such traumatic causes as chiropractic manipulation, football injuries, traction to the neck, yoga, car accidents, fractures, and subluxations, and noted a report of one case in which a man occluded his vertebral artery simply by bending his head back for two hours while painting his ceiling.

Despite this testimony, it is clear that vertebral artery injury as the result of a beating, even one as severe as that sustained by Bergman, is a rare occurrence. In fact, there was no testimony specifically relating cases of vertebral artery injury as the result of a beating. Dr. Gilroy stated that in the course of personally performing thousands of arteriograms, he routinely discovered occluded vertebral arteries, but his testimony was merely that "some" of those were from traumatic causes. Dr. Reinmuth conceded that he could not rule out the possibility of a vertebral artery

injury given a beating, but he testified that in his opinion such injury was highly unlikely and that vertebral artery injury in general is rather rare. Dr. Victor testified that although he has seen many patients who have been brutally beaten, he has never seen a vertebral artery occlusion in such a case. At best, Plaintiffs proved that it is not impossible that Bergman could have sustained this kind of injury.[8]

Even assuming a vertebral artery injury or occlusion, the Government's experts reject the reasoning by which Dr. Gilroy then posits a brainstem infarction that causes impairment of autoregulation. Dr. Reinmuth discounted Gilroy's description of autoregulation and propounded an entirely different one. Instead of the nerve stimulus theory of autoregulation to which Dr. Gilroy and his cited authorities subscribe, according to Reinmuth the most widely studied mechanism and the "standard theory of regulation of blood flow" since 1895, is "metabolic autoregulation." (TR D 343). Briefly, he explained that metabolic autoregulation functions as the result of the production of acid in tissue at a cell by cell level in the brain, right next to the blood vessels that supply microscopically local territory. The nerve cells burn sugar, producing carbon dioxide and lactic acid, which then interacts with the blood vessel. As the amount of carbon dioxide and lactic acid produced increases (the harder that portion of the brain is working), the blood vessel dilates so that more blood is able to flow through. (TR D 343–344).

Under this theory of autoregulation, Dr. Reinmuth testified that he is unaware of any way to destroy autoregulation by one or even two infarcts specifically placed in the brainstem. In order to impair autoregulation, he testified that a very large segment of the brainstem must be seriously damaged. He directly contradicted Dr. Gilroy's testimony that the autoregulatory system depends on the integrity of the whole, and stated instead that the brain

---

**8.** I note that, even assuming Bergman's brain damage is traceable to a vertebral artery injury, the possible causes are almost limitless, if in fact a vertebral artery may be as easily injured as Dr. Gilroy testified.

has redundancies to protect against destruction of such vital functions. (TR D 371–372). Dr. Reinmuth knows of no mechanism localized in the brainstem that regulates blood flow there and in the cerebellum. (TR D 401). On direct examination he stated, "If I were to design a method to destroy autoregulation by brainstem lesion, I am not sure that I would know how to go about it. It would be extremely difficult." (TR D 372).

Dr. Gilroy himself recognized the existence of this competing school of thought on autoregulation (see TR D 231), and did not testify that the nerve stimulus theory was widely accepted. He relied on articles which came mainly out of one laboratory. None of these articles were introduced into evidence, and they were not attacked with specificity by Dr. Reinmuth. However, I note that Dr. Reinmuth has extensive and current experience in the area of cerebral blood flow study. He testified that all of his research over 30 years as a neurologist has been in experimental understanding of mechanisms of cerebral circulation, how it is regulated and how it responds to stresses. Dr. Gilroy, while an impressive authority and a credible witness, has not been as extensively involved in the study of cerebral vascular disease. His research concentrated on this area from approximately 1960 to 1968, but after that his focus changed to the fields of neuro-audiology and neuro-imaging of the brain. Dr. Reinmuth's testimony convinces me that the nerve stimulus theory of autoregulation and the idea of a center of autoregulatory control in the brainstem, are not widely accepted in the neurological community. I cannot find that Dr. Gilroy's version of the medical truth is more correct than Dr. Reinmuth's, solely on the basis that the nerve stimulus theory coincides with Dr. Gilroy's explanation of Bergman's injury.

More importantly, there is no evidence that Dr. Bergman had symptoms during the four months between the beating and the operation that would support Plaintiffs' theory of vertebral artery injury and brainstem damage. Dr. Gilroy testified that symptoms could have been absent or minimal, and noted that reports of some neurological changes in Bergman—the foot drop and haziness—could be indicative of such injury. But on cross-examination the only objective evidence he pointed to as proof of impaired autoregulation, was the destruction of the cerebellum. (TR D 258).

Dr. Reinmuth and Dr. Victor opined that the lack of direct evidence of vertebral injury and brainstem damage made Plaintiffs' claims highly unreasonable.[9] Both of the Government's experts testified that they found no evidence of vertebral basilar insufficiency or brainstem damage in Bergman's medical record. Dr. Victor, while agreeing with Dr. Gilroy that an artery may be occluded without symptoms, testified that in a 61-year old individual, symptoms such as acute vertigo, nausea, vomiting, facial weakness, inability to use the limbs on one side and a loss of sensation on the other side, would normally be present. Dr. Reinmuth testified that an asymptomatic brainstem infarction simply would not be severe enough to impair autoregulation.

There was some testimony from Dr. Gilroy that impairment of the vertebral artery alone might have caused a loss of autoregulatory function in Bergman. On cross-examination, Dr. Gilroy testified that the absence of brainstem damage "might not" affect the validity of his theory. (TR D 249). He went on to say that there is "some evidence which I didn't talk about which simply interfering with the basilar of the, vertebral basilar system, may lead to loss of autoregulation." (TR D 249). He explained that people with vertebral basilar insufficiency will have periodic symptoms of reduced blood flow to the brainstem and impaired autoregulation, and stated that vertebral basilar insufficiency "could"

---

**9.** The experts agreed that if Bergman's vertebral artery had indeed been occluded it would most likely have remained that way. Plaintiffs demonstrated that although there are tests currently available to demonstrate the presence of such an occlusion, they would subject Bergman to undue risk. But this problem cannot make up for the lack of factual support for their theory.

"possibly" result from traumatic injury. (TR D 250).

Dr. Gilroy testified that this theory of impaired autoregulation from vertebral basilar insufficiency is apparently well-accepted, since articles to that effect have been published. (TR D 250–251). Dr. Reinmuth admitted that if one vertebral artery is injured, that segment might lose its autoregulatory capacity, but he testified that one would expect that the rest of the vertebral basilar system would maintain its autoregulatory response. He did not believe that such an impairment would last longer than a few weeks. (TR D 373).[10] The vertebral basilar insufficiency theory of autoregulatory impairment, raised by Dr. Gilroy only during cross-examination, was not incorporated into his discussion of causation with specific reference to how it may or may not have affected Dr. Bergman, and Gilroy's testimony suggests that it is no more than speculation. Dr. Gilroy clearly rested his theory on his testimony that the "most likely" event was impairment of autoregulation by damage to the brainstem. (TR D 224).

I cannot ignore the fact that the addition of the concept of autoregulation to the Plaintiffs' causation theory apparently occurred long after Dr. Gilroy had theorized a vertebral artery injury. In opening and closing statements, Plaintiffs' counsel suggested that they had two theories of causation, one involving autoregulation and one simply relying on impaired circulation in the vertebral artery. However, a careful review of Dr. Gilroy's testimony reveals that in fact, autoregulation is essential to his theory of a chain of causation.

Gilroy never testified at trial that the impairment of circulation which would have been caused by the occlusion would alone have resulted in the damage to the cerebellum. Rather, his testimony was that this would have been a factor in combination with impaired autoregulation. (TR D 85, 96). He stated that autoregulation is very important in this case (TR D 84), and testified that with impaired autoregulation,

... the effects of variation to blood pressure, of course, would now be felt; whereas, if autoregulation was functioning they would not.... With a fall in blood pressure, the vessels in the, over the cerebellum should have opened up to compensate and allow maintenance of blood flow. Since autoregulation is impaired, they would not do this, and, therefore, the cerebellum would be impaired from a fall in blood pressure. That is what I think happened here.

(TR D 87–88). This "refinement" of Dr. Gilroy's earlier theory takes for granted his original conclusion that there must have been a vertebral artery injury, while admitting that his first analysis contained an important flaw. The concept of a brainstem infarction that caused impaired autoregulation maintains the internal logic of the theory, but Plaintiffs have effectively failed to re-build the bridge of causation between the cerebellar damage and the beating with this new element in mind.

In addition to these weaknesses in Plaintiffs' autoregulation theory, there is some indication in the evidence that Bergman's autoregulatory system was *not* impaired after the beating. Dr. Reinmuth made this observation on the basis of Bergman's testimony about the strenuous work he engaged in during the summer of 1961, building the switchback trail on his property. In Reinmuth's opinion, this kind of exertion would have tested Bergman's ability to respond to blood pressure fluctuations. He explained that vigorous activity of the type described by Bergman would have caused Bergman's blood pressure to rise, and fluid and salt loss through perspiration followed by rehydration could have caused Bergman's pressure to fall below normal. According to Dr. Reinmuth, someone without autoregulation would be extremely sensitive to even modest changes in pressure when working in an upright posture, and

10. Although Dr. Gilroy testified that autoregulation reportedly could remain impaired for up to a year, even he conceded that there is no way to predict the length of such an impairment or to establish how long it might have lasted in Dr. Bergman's case. (TR D 233).

would feel dizzy and faint. He testified that with impaired autoregulation and an increase in pressure, there would be a high risk of brain hemorrhage. Since Bergman testified that he had experienced no dizziness or other problems that summer, his autoregulatory system must have been accommodating those changes in pressure, Reinmuth testified.

Dr. Gilroy opined that impaired autoregulation would not have caused Bergman to exhibit symptoms if his blood pressure had risen, but he did not elaborate on why autoregulation would not be stressed at the high end of the scale. Dr. Reinmuth conceded on cross-examination that there is no specific evidence that Bergman's blood pressure ever fell below normal between May and September 1961. But he persisted in his testimony that he could posit hypotension as well as hypertension from the kind of strenuous exercise Bergman had described. According to Dr. Reinmuth, autoregulatory mechanisms respond to both increases and decreases in blood pressure, thus affecting circulation with a fluctuation in either direction. While the evidence on this point is not conclusive, I accord Bergman's lack of symptoms during the summer some weight in evaluating Plaintiffs' theory.

In light of all of the evidence discussed above, I am not persuaded by a preponderance of the evidence that Bergman suffered a vertebral artery injury on May 14, 1961 that resulted in brainstem damage and impaired autoregulation, and that subsequently caused Bergman to suffer severe cerebellar injury. Given that the possibility of an asymptomatic vertebral artery injury from a beating cannot be ruled out, and that Dr. Gilroy's autoregulation theory is apparently accepted by at least part of the medical community, I am convinced that the injury *possibly* occurred as hypothesized by Plaintiffs. But this simply is not enough. Moreover, I find that evidence of a mild cerebral deficit, and questions concerning the length of the cardiac arrest, cast serious doubt on the factual premises of a one minute, 45 second period of anoxia, and of isolated cerebellar injury,

from which Dr. Gilroy's entire theory proceeds. This is critical, since Plaintiffs' argument is that Dr. Gilroy's theory should prevail because it is not only possible, but the only possibility that fits.

### Presence of Cerebral Injury

Plaintiffs' theory of causation relies on the premise that Bergman suffered isolated damage to his cerebellum, and that any indications of mild cerebral impairment are inaccurate or not attributable to the operation. I find that testing done in 1975 as part of a reevaluation of Dr. Bergman's condition reveals slight cerebral deficits that cannot be dismissed out of hand.

When he examined Bergman in March 1983, Dr. Gilroy found no problems with Bergman's intellectual and cognitive functions. Upon testing the cranial nerves, Dr. Gilroy found no abnormalities except for certain problems with eye movement, which he testified could be indications of injury to the brainstem. He found Bergman's basic sensations normal, although he did not test beyond touch, pain, vibration and position sense, because he felt that given Bergman's age and the tremor, more discriminating tests would be invalid. Bergman's deep tendon reflexes were normal and symmetrical and his skull was normal. Dr. Gilroy testified that the examination revealed no findings of cerebral injury, and he concluded that the neurological injury was cerebellar "in almost pure form." (TR D 61; Ex. 24).

The Government's experts have no quarrel with Dr. Gilroy's examination, but they disagree with his conclusions, based on certain testing information contained in Bergman's medical records. Dr. Reinmuth agreed that Dr. Bergman's cerebration is excellent. He agreed that Bergman's records indicate that at least since several months after the arrest, he has had severe damage to the cerebellum with at best mild injury to the cerebrum. And Dr. Reinmuth conceded that the progress notes contain indications of a return of cerebral function within a relatively short time after the op-

eration. However, in his opinion this does not mean that the cerebrum was not damaged during the operation. In Reinmuth's opinion, Bergman had a good recovery, even though a lot of cells did not survive, because of redundancies built into the brain. (TR D 396). Dr. Whelan, a neurologist who saw Bergman on a consultation basis on October 2, 1961 and on several occasions in later years, apparently reached a similar conclusion. He noted in May, 1969 that Bergman "undoubtedly had diffuse neuronal damage at time of cardiac arrest and despite fairly good recovery ... he operates from a decreased brain cell reserve," although he also observed that time was taking an additional toll on Bergman's brain. (Ex 2, p 71).

Another neurologist, Dr. McHenry, examined Bergman on September 11, 1975. The findings contained in his report are in large measure consistent with those made by Dr. Gilroy on his examination of Dr. Bergman. Dr. McHenry noted that Bergman was mentally alert, and that he had no problem with words or expression. He, like Dr. Gilroy, noted poor elevation of eyes, but otherwise that the cranial nerves seemed intact. He found position and vibration sense were also intact. But, unlike Dr. Gilroy, he went on to note that Bergman did have a problem with two point discrimination and number writing on fingers, hands and feet. Two point discrimination involves touching the patient's finger with a two-pointed instrument which can be set at graduated degrees of distance between the points; the patient is asked to indicate whether one or two points are felt. The number writing test requires the patient to identify a numeral as the examiner writes it on the patient's skin without allowing the patient to look. In testing stereognosis, Bergman was required to identify an object by clasping it in his hand, and there McHenry found that Bergman "identifies coins OK." Dr. McHenry's impression was "residuals of cerebral anoxia" including cerebellar type ataxia and "possible cortical impairment." He recommended neuropsychological testing. (Ex. 2, p. 17).

Pursuant to that recommendation, Bergman was tested by a psychologist, Dr. Bast, on September 11, 12, and 15, 1975.[11] Dr. Bast found only questionable to mild dysgraphesthesia (number writing problem) on the left hand. But another cortical sensory perceptual exam revealed mild finger dysgnosia on the left hand. (Ex. 2, p. 18). According to Dr. Victor, this reflects some incapacity to recognize the fingers of one's own hand or to name and identify the fingers of the examiner's hand. (TR D 514).

Bergman's scores on the Wechsler Adult Intelligence test showed a verbal IQ of 148, while his performance IQ was 124. Dr. Bast reported that "[s]ubtests indicate mild deficits with uptake on immediate memory as reflected by decreased attainment with Picture Arrangement & Digit Span items." Dr. Bast's impression was that in addition to the severe cerebellar dysfunction, Bergman showed mild bitemporal involvement, probably with hippocampal foci.[12] He then went on to note,

It is difficult to perceive this [patient], who has a very superior IQ, as showing some dementia. However, there is sufficient evidence in the data to indicate that he has lost some of his former capacity with immediate memory functions. In this sense he does show a very mild, static and non-progressive dementia.

(Ex. 2, pp. 18–19).

Both Dr. Reinmuth and Dr. Victor testified that these findings were indicative of mild cerebral impairment. This conclusion is not inconsistent with the findings made by Dr. Gilroy on his examination of Dr. Bergman, since he did not undertake the sophisticated kind of testing done by Dr.

---

11. Although Dr. McHenry's referral was apparently directed to a Dr. Schwartz, the report was signed by Dr. Bast. I therefore assume that references at trial to Dr. Schwartz' report, in fact refer to the report signed by Dr. Bast.

12. The hippocampus is an area of the cerebrum concerned with memory and is one of the first areas of the brain affected by lack of blood flow. (TR D 68).

Bast. Dr. Victor explained that only the discriminating testing reported by Dr. Bast would allow Bergman's mild cerebral abnormalities to be detected. (TR D 484–85). Although it was not specifically noted by Dr. Bast in his report, Drs. Reinmuth and Victor testified that the disparity in Bergman's verbal and performance IQ scores is also an objective sign of slight injury to the cerebral cortex. (TR D 422, 484–85, 522–23).

Dr. Gilroy questioned Bast's findings of dysgnosia and the slight problem of dysgraphesthesia noted by both Bast and McHenry, pointing out that even the examining doctors did not find a strong indication there. Dr. Gilroy attributed their findings to Bergman's tremor, which in his opinion would affect the ability to accurately perform these tests as well as two point discrimination. He noted that Bergman had no problem with stereognosis, where the tremor would not be a factor.

In Dr. Gilroy's opinion, the minimal brain damage reported by McHenry and Bast may have been quite normal, given Bergman's age at the time the testing was performed. He specifically noted that memory problems are not unusual for someone at Bergman's age. (TR D 271). However, Dr. Victor explained that a mild, static and non-progressive dementia such as that reported by Dr. Bast, is different than the kind of memory loss associated with aging. Dr. Victor was of the opinion that Dr. Bast would have noted it if he had felt the memory loss was due to aging, since that is a discrete, identifiable phenomenon. (TR D 518–20).

Dr. Gilroy's observation that some of the findings by McHenry and Bast are only questionable or phrased tentatively, is well taken. But I do not find that those doctors' conclusions should be ignored altogether. Both McHenry and Bast found some cerebral involvement, after a significant amount of subtle testing. The Plaintiffs argue that because there was no need to determine the cause of Bergman's problem at the time these consultations were obtained, the reports may not draw the kind of fine distinctions required in the context of this litigation. However, I note that Bergman's 1975 admission at Grace Hospital was specifically for the purpose of an intensive reevaluation of his condition. Under these circumstances, I do not believe that mild bitemporal involvement would have been noted if it were only questionable.

Moreover, I am convinced that if the findings were affected by Bergman's tremor or his advanced age, the reports would have noted that fact. On cross-examination, Dr. Gilroy conceded that Dr. McHenry is a competent neurologist who would have made a notation if his conclusions were questionable because of a tremor. Bast's report indicates that he did not fail to take considerations of Bergman's physical symptoms and age into account in evaluating the results of his testing. He observed that Bergman had a problem with severe ataxia on a test dealing with visual motor integration. And in connection with a test of Bergman's finger tapping speeds, Bast expressly took Bergman's age into consideration, in his comment that the results were indicative of impaired speech and coordination.

For these reasons I cannot accept entirely Dr. Gilroy's explanation for the findings of mild cerebral impairment.[13] One of the factual premises under which Dr. Gilroy operated was his finding that Bergman had no cerebral injury. (*See* TR D 63). And while his testimony often referred to Bergman's injury as "predominantly" rather than "purely" cerebellar, his theory did not account for any damage to the cerebrum.

---

13. According to Defendant's experts, a series of EEG readings taken from 1962 to 1969 also evidenced mild cerebral impairment. I find the EEG reports to be largely inconclusive on this issue. While there is some evidence that the tracings indicated a diffuse disturbance, the results could not be decisively related to the anoxic incident, and some findings were expressly noted to be "nonspecific." Nor do I place any emphasis on Dr. Mogill's many references to "cerebral" injury in his notes, since he clearly did not intend to distinguish cerebellar and cerebral damage by those comments.

Specifically, he had explained that the one minute, 45 second cardiac arrest would not have caused permanent damage to the cerebrum, and he testified that the portion of the cerebrum supplied by the vertebral basilar system was protected by the Circle of Willis. In addition, the testimony indicated that Bergman's blood pressure had not dropped sufficiently during the operation to affect the cerebral hemispheres during the period of hypotension, since autoregulation was not impaired in the carotid artery system. In sum, Dr. Gilroy did not attempt to integrate evidence of mild cerebral deficit into his theory of causation, but relied solely upon his opinion that these findings were inaccurate or attributable to old age or Bergman's tremor.[14]

### The Cardiac Arrest and Bergman's Cerebellar Syndrome

The presence of some cerebral damage raises a question whether the cardiac arrest was in fact of longer duration than the surgeon reported in his post-operative note. Dr. Miller's written note stated:

5:52—[Patient] developed cardiac arrest at this time. Dr. Sphire immediately gave cardiac massage by sternal compression. This was quickly effective in restoration of cardiac action & peripheral pulses. Total length of time of absence of effective heart action is estimated at about 1 minute & 45 seconds.

(Ex. 2, p. 199).

Plaintiffs contend that since nowhere else in the medical record is the length of the cardiac arrest specifically noted in terms of minutes and seconds, this written estimate by the surgeon who was present at the time is the best evidence available of the event that occurred over 22 years ago.[15] On this basis they urge the Court to find as

a fact that the cardiac arrest lasted only one minute, 45 seconds. Of course, such a finding (or at least one of under three minutes) is critical to the Plaintiffs' theory, since when viewed in conjunction with Bergman's severe cerebellar damage, it raises the question that Dr. Gilroy's theory seeks to answer.

The experts testifying for the United States discounted Dr. Miller's notation, which they point out is merely an estimate, and also inherently inaccurate given the pandemonium that occurs during a cardiac arrest. It was the opinion of Dr. Reinmuth and Dr. Victor that both the anesthesia record and Bergman's severe brain damage attest to a cardiac arrest lasting beyond the critical three to five minute period in which no permanent damage would have been sustained.

The anesthesiology record indicates systolic and diastolic blood pressures,[16] pulse rate and respiration rate, on a graph divided into five-minute intervals. It also contains notations indicating when drugs were administered, and notes the fact of cardiac arrest. None of the several copies of the record which were received in evidence (Ex.s 28; B; 2, p. 221; Dep Sphire, ex. 2) sets forth the precise timing of those events. In large part, this is due not to the unclarity of the copies, but to the ambiguity of the record itself.

When the operation started, Dr. Bergman's blood pressure was 120/80, with a pulse of 80. At 5:35, blood pressure dropped to 100/50, and by 5:45 it had fallen to 80/50. Bergman's pulse had also fallen, from approximately 95 at 5:35, to 80 at 5:40, to about 75 at 5:45. (Ex. 2 p 221). At 5:45, methedrine was administered in an attempt to raise the blood pressure. (Dep Sphire, pp 27–28). Dr. Reinmuth testified

---

**14.** I note that Gilroy was specifically asked how the minimal cerebral damage reflected in the medical record would be consistent with injury to the cerebrum that would have occurred during the cardiac arrest. Gilroy attributed the findings to the aging process, and went on to testify that it could not have been caused by the arrest, because it did not last long enough. (TR D 100–101).

**15.** Dr. Sphire was the anesthesiologist in charge of Bergman's case at the time of the operation, but his deposition discloses that he has no present recollection of the events of that day.

**16.** Systolic and diastolic pressures simply reflect that the pumping action of the heart produces a high and low pressure with each heartbeat.

that at this point it becomes apparent that cardiac arrest was approaching, because there was no corresponding increase in pulse rate when the pressure dropped to 80/50. (TR D 366).

The experts agreed that the arrest did not occur prior to 5:50. In fact, the record is consistent with Dr. Miller's note that the arrest occurred at 5:52.[17] No blood pressure was recorded from 5:45 until approximately 5:57, but Dr. Reinmuth testified that the vital signs recorded at 5:50 indicate a pulse of 70 falling to 60. (TR D 367). A pulse of 50 is marked midway between 5:50 and 5:55, approximating the time noted of 5:52. The notation of these pulses indicates that a blood pressure was present, but was simply not recorded. (TR D 368–369, Reinmuth). A written notation between 5:50 and 5:55 on the chart states that no blood pressure or pulse was obtainable at that time. It appears that the pulse noted at approximately 5:52 is the last vital sign recorded prior to cardiac arrest, and that that event occurred for some time period between 5:52 and approximately 5:57.

From 5:55 to 6:00, the blood pressure marks are blurred and ambiguous. A systolic presure of approximately 95 is recorded shortly after 5:55, followed by one of 200, then a 6:00 systolic reading of 180. There is only one clear diastolic pressure on the record during that time period, midway between 5:55 and 6:00, at a pressure of about 70. This appears to correspond to the systolic pressure of 95. I find one or two diastolic marks immediately following, at a pressure of approximately 100, that would appear to correspond to the 200 systolic and the systolic pressure of 180 recorded at 6:00.[18]

Dr. Reinmuth testified that the hypertensive pressure at 5:57 is an indication of

recovery from cardiac arrest. (TR D 466). And I am inclined to believe that the cluster of marks between 5:57 and 6:00 is indicative of a flurry of monitoring vital signs that would logically follow resumption of a heartbeat. The next clear recording of vital signs appears immediately after 6:00 p.m., and indicates a pressure of 150/100. Following that reading, the vital signs become regular again.

From the facts noted on the anesthesia record, the cardiac arrest would appear to have lasted as long as five minutes: from 5:52 to 5:57. I agree with Plaintiffs that Dr. Miller would have been trying to be as accurate as possible in his estimate of the length of cardiac arrest. But I am persuaded to some extent by testimony that keeping track of the time "is the one thing that almost no one always does unless at least the first sort of urgent events have occurred...." (TR D 394, Reinmuth). The puzzle presented by the anesthesia record and Dr. Miller's notation is not resolved by looking at the record as a whole. There appears to be no notice taken of what Plaintiffs claim is a unique discrepancy between the reported length of arrest and the fact that Bergman had obviously sustained some brain damage. In a written summary of the event, Dr. Sphire noted that the period of anoxia had been very brief, but went on to state:

> In any event, cerebral hypoxia, has occurred and the [patient's] progress will now depend on the original extent of damage and whether the steps now underway will be able to limit the likelihood of further cerebral loss. At the present the prognosis is poor.

(Ex. 2, p. 201).

To complicate matters further, the anesthesiology record may not accurately re-

---

**17.** I note that during cross-examination of Dr. Reinmuth, Plaintiffs appeared to contend that the 5:52 notation was wrong, and that the arrest occurred between 5:57 and 6:00 p.m. (*See* TR D 434, 463). Even Dr. Gilroy did not seem to propound that theory (*See* TR D 228), and it is not the most reasonable interpretation of the evidence. Moreover, there is no basis for an assumption that the one minute, 45 second nota-

tion is correct but that the 5:52 observation is in error.

**18.** The copy of the anesthesia record attached as Exhibit 2 to Dr. Sphire's deposition provides the clearest copy of this particular portion of the chart.

flect what occurred in the operating room. Generally, it was the practice at the time to record vital signs every five minutes during surgery. (Dep. Sphire, p. 25). Thus the five minute gap in the pressure and pulse notations is not necessarily significant. In addition, given the number of activities that would have been going on during the cardiac arrest, vital signs taken at five minute intervals may have been observed but not placed on the chart. (*See* TR D 366). I find that although the written estimate by Dr. Miller standing alone appears to be an accurate description of what occurred, in light of all of the facts, the notation is inconclusive; it is at least equally possible that the arrest lasted long enough to cause permanent damage to the entire brain.

Plaintiffs argue that cardiac arrest alone would not have resulted in a predominantly cerebellar syndrome, and that therefore the evidence points toward their theory of a short period of cardiac arrest and a preexisting impairment in cerebellar circulation. I disagree. I might have been persuaded by this argument if in fact Bergman did not have cerebral deficits, since the evidence demonstrated that anoxia would be expected to produce at least *some* cerebral impairment. (*See* TR D 529). But as I have already found, the medical record does reflect some mild cerebral deficits which Plaintiffs' theory has been unable to take into account.

If Plaintiffs had shown that a predominantly cerebellar syndrome and only mild cerebral damage simply would not result from anoxia, their theory would gain some credence. But I find the evidence indicates that, although rare, such a syndrome can occur. Dr. Gilroy testified that *usually* there is major involvement of the cerebral hemispheres, (TR D 68), and Dr. Reinmuth agreed that *most* patients who suffer anoxic insults do not escape significant deficit in that area of the brain. But according to Reinmuth, while the cerebrum is much more likely to recover poorly after anoxia than is the cerebellum, the reverse does occur in some people. (TR D 420). Dr. Victor testified that the results of recovery

from acute anoxia are variable, and that any one of several possible sequelae, including cerebellar ataxia, may predominate. (TR D 478–479). He described this class of cases as a minority, but nevertheless a well-defined group. (TR D 490).

In their opening statement and pretrial brief, Plaintiffs asserted that the brain is injured first in the cerebrum and then in other areas, because of a "hierarchy of susceptibility" of the cerebral cells to anoxia. Thus, they reasoned, cerebral damage would always be more severe. Dr. Gilroy did explain that anoxia causes diffuse damage because cells with especially high needs for glucose and oxygen are distributed throughout the brain. However, he did not testify that the cells in the cerebrum are more susceptible to damage from anoxia than, for example, the Purkinje cells in the cerebellum. (TR D 244–45). According to Dr. Victor, whose textbook on neurology is a standard work in the field, neurologists have not yet been able to explain why one symptom or another may predominate. (TR D 478–79).

Dr. Gilroy testified that aside from Dr. Bergman, he has never seen any cases of selective cerebellar damage after cardiac arrest, even though he is the chief neurologist in a major medical center with the third highest admissions in the country. He pointed to the fact that he has not seen such cases in the literature, as additional support for the proposition that these residuals will not occur from anoxia alone. Both Dr. Reinmuth and Dr. Victor on the other hand, testified that they have personally encountered cases similar to Bergman's during their careers. (TR D 379, 485–86, 531–32). Dr. Victor testified that the fact that such cases have not found their way into the literature is simply one example of "innumerable commonplace clinical events that have never been described." (TR D 540). I believe the truth lies somewhere between this characterization of a predominantly cerebellar syndrome as commonplace, and Dr. Gilroy's testimony that it does not occur from anoxia. The testimony convinces me that such

residuals can occur, but that they are very rare.[19] These considerations, when combined with the evidence of some cerebral impairment, lead me to believe that the anoxia alone is the more plausible cause of Dr. Bergman's condition.

I am aware that the history of the beating did not go unnoticed by doctors over the long course of Bergman's initial hospitalization and subsequent evaluations and therapy. It was noted when Bergman was admitted to Grace Hospital on September 16, 1961 (Ex. 2, pp. 196–197), and by Dr. Hardy, who saw Bergman within a few hours of the cardiac arrest. Hardy suggested that a test be conducted "to rule out subdural since some think [Bergman] was drowsy or confused since his beating." (Ex. 2, p. 218). This possible connection however, was never borne out by the record. Dr. Whelan noted in October 1961 that the "[i]njury in May sounds rather minimal relative to brain injury. Unconsciousness was very brief." (Ex. 2, p. 215).

Dr. Mogill regularly noted the beating as part of Bergman's relevant medical history, (Ex. 2, pp. 15, 65, 67, 69), and made more than one observation that "it was felt that the cardiac arrest had direct association with this previous trauma." (Ex. 2, p. 65); *see also,* Ex. 2, p. 67; Ex. 1, pp. 16–17; Ex. 3, p. 25). But these general remarks of a causal connection looked more to an explanation of the cardiac arrest than to its residuals. There is no claim here that the arrest itself is somehow attributable to the Anniston beating.

The proximity of the two events does raise a question mark in my mind, as it apparently did in the thoughts of Bergman's physicians. Moreover, I recognize the difficulty of reconstructing an event that occurred over 22 years ago, and I have balanced the evidence in light of a standard of proof that requires only that the proofs tip in Plaintiffs' favor by the slightest margin. Nevertheless, for all the reasons I have discussed, I cannot find that Plaintiffs have proven causation by a fair preponderance of the evidence.

## II. DAMAGES

A large portion of the damage claim made by Plaintiffs in this case stems from Dr. Bergman's condition following the appendectomy. Because I have concluded that a causal connection between that condition and the beating in Anniston was not proved, Walter Bergman may not recover damages in this action for medical expenses, or for the pain and suffering he has endured since the September 16, 1961 operation.[20] Likewise, the estate of Frances Bergman may not recover damages for the mental deterioration she suffered in the years before her death in 1979, since Plaintiffs' claim is that such emotional suffering resulted not directly from her experiences

19. Drs. Reinmuth and Victor testified that in their opinion certain reported cases of predominantly cerebellar syndromes following anoxia were analogous to Dr. Bergman's clinical picture. Dr. Gilroy disagreed, since all of these case examples included evidence of myoclonus. Myoclonus is a symptom of nervous dysfunction, manifested by extreme muscle jerkiness, (TR D 388–89), which the defense experts associated particularly with cerebellar dysfunction (TR D 534). Other authorities, however, view this syndrome as reflective of disease in the high brainstem and thalamus. (TR D 535–36). Based on this latter view, Dr. Gilroy contended that the myoclonus distinguished Bergman's case, and stated that a person would not have myoclonus as a symptom, with just cerebellar damage. (TR 260–261). Because I find credible the testimony of Drs. Reinmuth and Victor that they have seen at least some patients with anoxic residuals similar to Bergman's symptoms, I need not decide whether or not the myoclonus cases are indeed analogous. I do note, however, that Dr. Bergman's medical record contains reports of myoclonus as late as May of 1962. (Ex. 3, pp 23, 34–36, 68). And there was some indication at trial that the anecdotal descriptions of predominantly cerebellar abnormality with accompanying myoclonus, referred to patients in the acute post-anoxic phase. Dr. Victor opined that the myoclonus in some of these individuals, as in Bergman, may not have remained. (TR D 533, 535).

20. For this reason, the Court need not address the parties' contentions with regard to Plaintiffs' exhibit 30, Dr. Bergman's medical bills.

on the freedom ride, but from the strain of caring for her disabled husband.[21]

Though the Plaintiffs were unsuccessful in their attempt to prove that the beating in Anniston had far-reaching physical consequences for Dr. Bergman, the injuries he and his wife sustained in Alabama were not insubstantial. Dr. Bergman endured physical pain and suffering during the beating and for several days afterward. Moreover, both he and Frances Bergman were subjected to the terror of a real threat of violence, from the time they arrived in Anniston, until federal protection was finally obtained for the freedom riders as they departed for New Orleans the following day. I have already found that the Government's negligence was the proximate cause of these assaults on the freedom riders. *Bergman v. United States, supra,* 565 F.Supp. at 1414. The sole question remaining is the amount of damages to be awarded.

 Under the Federal Tort Claims Act, Plaintiffs are entitled to compensatory damages in accordance with state law, with the exception that the United States may not be held liable for prejudgment interest or punitive damages. 28 U.S.C. § 2674. In Alabama, damages for mental anguish in cases of assault, false imprisonment and negligence, include compensation for insult and indignity, hurt feelings, mental suffering and fright. *Harrison v. Mitchell,* 391 So.2d 1038, 1040 (Ala.Civ.App.1980); *Standard Oil Co. v. Humphries,* 209 Ala. 493, 96 So. 629, 631 (1923); *see, Weston v. National Manufacturers & Stores Corporation,* 253 Ala. 503, 45 So.2d 459 (1950). Frances Bergman may recover such damages despite the fact that she was not beaten, since under Alabama law, even where there is no physical injury a Plaintiff may recover damages for mental anguish occasioned by the defendant's negligence. *Taylor v. Baptist Medical Center, Inc.,* 400 So.2d 369 (Ala.1981).

The circumstances of the Bergmans' bus ride from Anniston to Birmingham provide compelling evidence of the emotional stress under which they traveled.[22] When the Trailways bus on which the Bergmans were riding arrived in Anniston, an angry crowd armed with clubs, bats and chains surrounded the bus. The freedom riders were informed by their driver that the Greyhound bus carrying their companions had been firebombed, and they were told to segregate themselves according to the local custom. One or more police officers boarded the bus and repeated the news of the attack on the Greyhound bus.

These forebodings of violence soon erupted into the brutal reality of the beatings which have been described by the Court in this opinion (*supra,* p. 914), and in the opinion on liability (565 F.Supp. at 1379–80). The police had gotten off the bus before the attack, and Dr. Bergman testified that just before he was beaten, he had seen uniformed officers outside of the bus, and noted that they had made no movement to halt the violence that had

---

**21.** The fact that Plaintiffs may not recover damages for these conditions has the effect of mooting, in large part, the Government's continued motion for sanctions against the Plaintiffs under the discovery rules. The Defendant's only real concern was with regard to the lack of available medical information on both Frances and Walter Bergman. Defendant's argument that discovery on damages was too ambiguous merely addresses the amount of damages which the proofs will allow Plaintiffs to recover. This causes no prejudice to the Government. Therefore, I deny the Government's motion for discovery sanctions. I note that with the possible exception of Dr. Gilroy's new information on autoregulation, it does not appear that the Plaintiffs failed to disclose any information which they were able to obtain. Nor do I believe that there was any misfeasance on the part of the Plaintiffs or Dr. Mogill in connection with Dr. Mogill's incomplete medical records on the Plaintiffs; I have no doubt that the missing portions of the medical records were accidentally misplaced or discarded long ago, as Dr. Mogill explained.

**22.** Even before they reached Anniston, the freedom riders had some indication of the potential violence that surrounded them. Dr. Bergman had noted several white males on the trip from Atlanta to Anniston who appeared to be hostile. Moreover, threatening remarks were directed at the freedom riders on that leg of the trip into Alabama. They were told, "you niggers will be taken care of once you get in Alabama." *Bergman v. United States,* 565 F.Supp. at 1379.

already begun. Witnesses testified that Frances Bergman tried to come forward to protect her husband as he was beaten and thrown down the aisle of the bus. She was screaming for the police, and imploring the attackers to stop. (TR L 90, 138, 169). Only after the beatings did a policeman step into the doorway of the bus. He told the freedom riders that he'd seen nothing and could prove nothing. *Bergman v. United States*, 565 F.Supp. at 1380. Although Dr. Bergman was unconscious at the time, Frances Bergman must have been aware of this demonstration of a total lack of concern on the part of the local police.

With this experience behind them, the Bergmans faced a two hour bus trip in the company of their attackers. When the bus left for Birmingham, many of the violent crowd were still aboard.

> ... the leaders of the attackers sat in the front brandishing their clubs and Coke bottles, and making threatening remarks about what misfortunes awaited the Freedom Riders in Birmingham. Adding to the threat of a subsequent attack were several cars and trucks of people brandishing weapons, following the bus all the way into Birmingham.

*Bergman v. United States*, 565 F.Supp. at 1380. Although there was no overt violence after the initial beatings, Dr. Bergman's thoughts as he rode toward Birmingham convey the legitimate fear of further beatings and even death that he and the others entertained:

> ... [W]e did not know what was our destination. We wondered if we would go to Birmingham or if we would go up some side road where out of the sight of the public eye, the people who were riding with us and brandishing those Coke bottles—or colleagues that they might have had a rendezvous with—would attack us and we would receive, ah, serious and perhaps fatal beatings that they were threatening with their constant waving of those Coke bottles. (TR L 553).

In Dr. Bergman's words, "[t]he trip lasted by the clock about two hours. Psychologically, it lasted far longer." (TR D 24a).

The Bergmans' ordeal did not end with their arrival in Birmingham. Isaac Reynolds testified that when they reached that city, "You could look maybe 10 or 12 blocks, and all you could see were white angry faces." (TR L 95). Bergman testified that he noticed the absence of police and that the mob carried sacks containing lengths of pipe or something like small baseball bats. (TR L 525). According to a prearranged plan, Frances Bergman left the station and took a taxi or bus to Reverend Shuttlesworth's church. Dr. Bergman, however, remained at the station to act as an observer while two other riders, including James Peck, "tested" the facilities. Bergman was pushed by the mob, and Peck was badly beaten. Bergman had to half carry, half lead Peck to the street, and several taxis passed them by before they were finally picked up and taken to the church.

That evening the freedom riders attended a long meeting at the church, and as Dr. Bergman wryly observed at trial, it lasted late into the evening because "a mob ... of some 5,000 people surrounded the church. Finally, they left nearly midnight, and we crossed the street to the Shuttlesworth home." (TR L 529–30). The next day the freedom riders were unable to find a bus driver willing to carry them, and after trying futilely for some two hours to continue their trip by bus to Montgomery, they gave up and went to the airport. (TR L 530). There the freedom riders did finally receive protection and were able to leave for New Orleans, accompanied by a federal agent.

█ Defendant contends that only "minor pain and suffering was proven at trial" to flow from the Government's negligence, (Memorandum of Points and Authorities Regarding the Issues Related to the Damages Hearing, pp. 2–3), and that "[p]roof of any injury at all to the late Mrs. Bergman was wholly lacking." (*Id.*, p. 2, n. 3). I disagree. In determining whether or not the Plaintiffs suffered mental an-

guish which can be compensated under Alabama law, the Court is not limited to direct testimony relating feelings of indignity, mental suffering and fright. Mental anguish may properly be inferred as a natural and usual consequence from all of the circumstances in a case such as this. *Standard Oil Co. v. Humphries, supra,* 96 So. at 631; *Harrison v. Mitchell, supra,* 391 So.2d at 1040. Dr. Bergman's description of the atmosphere of violence and the apprehension of the group, and the evidence of Frances Bergman's expressions of fear during the beatings, provide some direct indication of the emotional impact of the circumstances. I find that in light of these facts, and given the threat of violence on the bus and in Birmingham, the beatings of Bergman and the others, and the knowledge that the police could not be counted on to protect them, the fright and mental anguish the Bergmans suffered must have been profound.

█ In addition to these injuries, the Bergmans were clearly deprived of their constitutional rights to equal protection of the law and to travel freely interstate. If this were an action to redress violations of civil rights under federal law, the deprivation of the substantive rights involved here would play some role in determining the scope of the intangible injury sustained. *Brandon v. Allen,* 719 F.2d 151 (CA 6 1983); *Green v. Francis,* 705 F.2d 846 (CA 6 1983); *Baskin v. Parker,* 602 F.2d 1205 (CA 5 1979); *Lenard v. Argento,* 699 F.2d 874 (CA 7), *cert. den.* —— U.S. ——, 104 S.Ct. 69, 78 L.Ed.2d 84 (1983); *Herrera v. Valentine,* 653 F.2d 1220 (CA 8 1981); *Corriz v. Naranjo,* 667 F.2d 892 (CA 10, 1981), *appeal dismissed per stipulation,* 458 U.S. 1123, 103 S.Ct. 5, 73 L.Ed.2d 1394 (1982). *Carey v. Piphus,* 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978), is not to the contrary. In that case, the Supreme Court held that in the absence of proof of

actual damages, plaintiffs whose procedural due process rights were violated were entitled to only nominal damages. Similarly, in *Nekolny v. Painter,* 653 F.2d 1164 (CA 7 1981), *cert. den.* 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 139 (1982), the Seventh Circuit denied a substantial recovery to the plaintiffs, where they had failed to show any actual emotional injury.[23] Here, the Bergmans were not only deprived of important substantive rights, but Dr. Bergman was brutally beaten, and both he and his wife were subjected to extreme emotional stress.

The United States argues that in this negligence action under the FTCA, it would be inappropriate to take into account the constitutional aspect of the injury the Bergmans sustained, and that the Court may only consider whatever physical and emotional impact the assaults may have had on the Bergmans. It is true that a plaintiff may not sue the United States directly under the FTCA for violations of the federal constitution. *Birnbaum v. United States,* 588 F.2d 319 (CA 2 1978); *Diminnie v. United States,* 522 F.Supp. 1192 (E.D.MI. 1981). But this case presents a unique situation, where state negligence law incorporates a federal duty. This Court has found that the United States was negligent *per se* under Alabama law in part because it violated its statutory duty under 42 U.S.C. § 1986 to prevent the racially motivated conspiracy from depriving the freedom riders of the equal protection of the laws.

One of the elements encompassed in the finding of negligence *per se* is that the injuries suffered by the Plaintiffs were of the type contemplated by the statute violated. Clearly, the deprivation of the right to equal protection and to travel freely interstate falls within the category of injuries contemplated by § 1986. *See, Bergman v. United States, supra,* 565 F.Supp. at 1394–

---

**23.** In fact, the *Nekolny* court recognized that where egregious circumstances exist, a finding of emotional injury may be entirely appropriate, pointing to its earlier decision in *Seaton v. Sky Realty Company,* 491 F.2d 634 (CA 7 1974). In that case, the Seventh Circuit found that humiliation could be inferred from the circumstances and that where the plaintiffs were subjected to a racial indignity, compensatory damages for that humiliation should have been awarded.

# 935

95. In fact, in discussing the nature of the negligence cause of action in that opinion, this Court specifically found that "the government's negligence lies in its failure to intercede to protect Plaintiffs' right to interstate travel and to equal protection of the law." *Id.* at 1411. It would be incongruous to now ignore those injuries in assessing damages.

The mental anguish and indignity which may be ascribed to constitutional deprivations are not foreign to the law of damages in Alabama. *See, Harrison v. Mitchell, supra,* 391 So.2d at 1040. Therefore, I find that under the circumstances of this case, "the nature of the wrong may be considered in computing plaintiffs' compensatory damage award." *Brandon v. Allen, supra,* 719 F.2d at 155.

Assessing the value of personal injuries is a difficult task. There is no fixed standard for computing such damages as physical pain and mental suffering, and the measure depends on the facts of each case. *Alabama Power Company v. Mosley,* 294 Ala. 394, 318 So.2d 260, 265–66 (1975).

> Normally, these factors are left to a jury to assign a value to their worth, but a court must draw upon its reasoning powers and, more importantly, its sensitivity to arrive at an appropriate level of compensation for these elements.

*Ross v. United States,* 640 F.2d 511, 521 (CA 5, Unit B 1981).

I find little guidance in Alabama case law on the question of the amount of damages that should be awarded under the circumstances of this case. In *Harrison v. Mitchell, supra,* perhaps the most analogous Alabama case on this question, the Alabama Court of Civil Appeals upheld a jury verdict of $5,000 for a plaintiff in an assault case. In that case, the plaintiff, Mitchell, was attempting to have his property surveyed, when he was confronted by his neighbor, Harrison. After being advised of plaintiff's purpose, Harrison stated that no one would enter his property, and he went to his house and came back with a shotgun. Harrison was loading the shotgun as he approached Mitchell, and he

pointed the gun at Mitchell and said, "You sorry son-of-a-bitch, I'll kill you right now." After some dialogue, Harrison returned the gun to his house. The assaults on the Bergmans were much more serious. The Bergmans were aware that their attackers were easily capable of physical violence; not only had Dr. Bergman and others just been beaten, but the Bergmans had heard that their companions on the other bus had apparently been firebombed. The potential that they would suffer a similar fate, or worse, did not abate until the freedom riders departed for New Orleans the following day.

The Government suggests that the case of *Mixon v. Traylor,* 266 Ala. 486, 97 So.2d 791 (1957), provides an appropriate comparison. In that case, an award of compensatory and punitive damages in the amount of $4,829.50 was held not excessive, where the plaintiff was shot in the back in the course of an argument in which he was not involved. Plaintiff was in the hospital for seventeen or eighteen days, had two operations and incurred a hospital and doctor's bill of $829.50. Because the Alabama Supreme Court was only faced with the question of whether such an award was excessive, it is unclear whether a higher verdict would have been sustained. Moreover, I must consider the fact that these damages were awarded 27 years ago, when the value of the dollar was considerably higher. I cannot find that such a minimal amount would compensate the Bergmans for the injuries they sustained.

Cases involving an award of damages for civil rights violations, under 42 U.S.C. § 1983, provide much closer factual analogies. In *Green v. Francis, supra,* the plaintiffs were a black couple who had been involved in heated litigation over a boundary line dispute with their white neighbors. During the litigation, plaintiffs found a sticker on their mailbox that read, "The Knights of the Ku Klux Klan are watching you." Some time later their home was riddled by a heavily damaging and dangerous barrage of gunfire, coming from the direction of their neighbors'

house. When the plaintiffs' son set out to get aid, his car was chased and also fired upon. Local sheriffs officers provided little protection, even though they were advised of the situation. Eventually, the plaintiffs were driven from their home and did not return. A jury awarded $30,000 to Mr. Green and $30,000 to Mrs. Green, and this award was upheld on appeal. The Court of Appeals noted that there was a loss in value to the Greens' home in the amount of $15,000, plus $6,000 damages to the furniture. The total award of $60,000 in compensatory damages was found not excessive:

> In light of this proof of tangible losses, and the fact that humiliation, mental suffering and the intangible loss of civil rights may also be compensated under § 1983, we conclude that the award ... was reasonable.

705 F.2d at 850.

In *Wheatley v. Ford*, 679 F.2d 1037 (CA 2 1982), Plaintiff sued under § 1983 for unlawful arrest and excessive use of force by police officers, in violation of his constitutional rights. Plaintiff had been struck with a "slapjack," his bare feet had been stomped on, and he was cuffed in the ears by the police officers. Although there had been some weak evidence that a slight hearing impairment had resulted from the attack, that loss was very minor. Originally, a jury had awarded Plaintiff $800 for the unlawful arrest and $1 for the unlawful use of force. The Court of Appeals remanded the unlawful use of force claim for retrial on the amount of damages, and on the second trial the jury awarded damages of $55,000. On appeal, the defendant claimed that the damages awarded were excessive. The Court of Appeals agreed that $55,000 was excessive under the circumstances, and held that $25,000 would be adequate compensation.

■ Having considered all of the factors discussed above, I find that Dr. Bergman

should be awarded $15,000 for his physical pain and suffering. He was brutally beaten on the bus, and suffered two black eyes and a swollen jaw.[24] For several days, Bergman was unable to eat solid food. While the injury was temporary, it was severe. In assessing the proper compensation for emotional injury, I have considered the emotional anguish, indignity and mental stress of the bus ride to Birmingham and the threat of physical harm that again confronted Bergman as he remained behind at the Birmingham bus station to observe, and during the meeting later that evening at the Reverend Shuttlesworth's church. In light of these facts, I award Dr. Bergman $20,000 compensatory damages for emotional injury and deprivation of his constitutional rights.

■ The injuries suffered by Frances Bergman were not as extensive as those of her husband, since she was not beaten and did not remain behind at the Birmingham bus station. However, she suffered the same threat of injury and possible death during the two hour bus ride, was confronted briefly by the angry mob in Birmingham and was constrained by the crowd outside the church that evening. She too suffered not only emotional injury in the sense of fear for her safety, but also the indignity of the deprivation of her right to equal protection of the law and to travel freely interstate. On this basis, I find that the estate of Frances Bergman is entitled to an award of compensatory damages in the amount of $15,000.

---

**24.** Plaintiffs' exhibits 237-S, T and U, received during the liability phase of the trial, indicate that Bergman's left eye was very badly bruised, although it appears that the injury to the right side was not as severe. These exhibits also demonstrate the swollen jaw to which Dr. Bergman testified.