844 F.2d 353
 10 Fed.R.Serv.3d 625
 Walter BERGMAN and James T. Drummond, as Personal
Representative of the Estate of Frances Bergman,
Plaintiffs-Appellants,
v.
UNITED STATES of America; Barrett G. Kemp, individually and
as a former employee of the Federal Bureau of Investigation;
four unknown agents of the Federal Bureau of Investigation;
and Thomas J. Jenkins, individually and as a former
employee of the Federal Bureau of Investigation, Defendants-Appellees.
 No. 87-1009.
 United States Court of Appeals,
Sixth Circuit.
 Argued Jan. 5, 1988.
Decided April 18, 1988.
Rehearing and Rehearing En Banc Denied June 2, 1988.
 
 Mark Granzotto (argued), Deborah LaBelle, Elizabeth Gleicher, William H. Goodman, Detroit, Mich., for plaintiffs-appellants.
 John A. Smietanka, U.S. Atty., Grand Rapids, Mich., R. Joseph Sher, Washington, D.C., Nicki L. Koutsis, Thomas M. Bondy (argued), Mark W. Pennak, Barbara L. Herwig, Dept. of Justice, Civ. Div., Washington, D.C., for defendants-appellees.
 Before MERRITT, KENNEDY, and KRUPANSKY, Circuit Judges.
 CORNELIA G. KENNEDY, Circuit Judge.
 Plaintiffs-appellants Walter Bergman and James T. Drummond[1] appeal the judgment of the District Court denying their claim for attorneys' fees against defendant-appellee the United States in this action under the Federal Tort Claims Act, 28 U.S.C. Sec. 2671 ("FTCA"). The plaintiffs assert that they are entitled to fees under the Equal Access to Justice Act, 28 U.S.C. Sec. 2412 ("EAJA").
 
 
 1
 Plaintiff Walter Bergman was beaten by a mob in Anniston, Alabama during the Freedom Rides, a civil rights protest, in 1961. Sixteen years later, in 1977, Mr. Bergman and his wife, Frances Bergman, sued the United States under the FTCA, contending that agents of the FBI could have taken steps to prevent the mob violence but failed to do so.
 
 
 2
 During pretrial proceedings the United States refused to comply with a discovery order to produce certain documents that contained information about confidential informers and that would disclose their identities.[2] The United States offered to present the documents for in camera inspection, but the District Court determined that such inspection would not be practical and would not be fair to the plaintiffs. Accordingly, the District Court, pursuant to Fed.R.Civ.P. 37(b), sanctioned the United States by foreclosing it from controverting the plaintiff's evidence or proceeding with its defense.
 
 
 3
 The plaintiffs prevailed on their FTCA claim, and the District Court awarded them $50,000 in damages. Plaintiffs then sought attorneys' fees against the government. Although the FTCA does not provide for attorneys' fees, the plaintiffs argued that they were entitled to fees under the EAJA. The District Court held that the plaintiffs were not entitled to attorneys' fees under either 42 U.S.C. Sec. 1988 or under common law principles, two bases available under the EAJA. Bergman v. United States, 648 F.Supp. 351 (W.D.Mich.1986). Plaintiffs appeal.
 
 I.
 
 4
 The general rule is that "[e]xcept to the extent it has waived its immunity, the Government is immune from claims for attorney's fees." Ruckelshaus v. Sierra Club, 463 U.S. 680, 685, 103 S.Ct. 3274, 3278, 77 L.Ed.2d 938 (1983). It is clear that the FTCA does not waive the United States' immunity from attorneys' fees. Joe v. United States, 772 F.2d 1535 (11th Cir.1985) (per curiam). However, the EAJA sets up a limited exception to the general rule of immunity: "The United States shall be liable for such fees and expenses to the same extent that any other party would be liable under the common law or under the terms of any statute which specifically provides for such an award." 28 U.S.C. Sec. 2412(b) (emphasis added). The plaintiffs argue that, pursuant to section 2412(b), they are entitled to attorneys' fees from the United States under the terms of 42 U.S.C. Sec. 1988,[3] and under the common law principle that a court may award attorneys' fees where the opposing party has acted in bad faith or has willfully disobeyed a court order.
 
 
 5
 The plaintiffs' second amended complaint alleged that individual defendants had violated 42 U.S.C. Secs. 1983, 1985(3), and 1986, (collectively "civil rights claims"), and requested both monetary and declaratory relief. Although their action against the United States was brought under the FTCA, and not the civil rights laws, the plaintiffs contend that they prevailed against the United States on their section 1986 claim, arguing that it was based on the same nucleus of common fact that underlay their FTCA claim, which they won. They also point out that the District Court stated in a previous opinion that "by so failing to prevent the violation of 42 U.S.C. Sec. 1985(3), the government violated Sec. 1986." Bergman v. United States, 565 F.Supp. 1353, 1396 (W.D.Mich.1983).
 
 
 6
 The United States contends that the plaintiffs' argument has two flaws. First, it argues that the plaintiffs did not prevail on their civil rights claims; the District Court never even addressed the merits of those claims. At the time the District Court made the statement upon which the plaintiffs rely, the civil rights claims had already been severed from the FTCA claim pursuant to a mistrial. The District Court made the statement in the context of supporting its finding of negligence under Alabama law. Second, even had the plaintiffs prevailed on their civil rights claims against the individual defendants, that would not entitle them to attorneys' fees from the United States. Since the civil rights statutes "by their terms, do not apply to actions against the United States," the plaintiffs could not have prevailed on a civil rights claim against the United States. Hohri v. United States, 782 F.2d 227, 245 n. 43 (D.C.Cir.1986), vacated on other grounds, --- U.S. ----, 107 S.Ct. 2246, 96 L.Ed.2d 51 (1987). Since no cause of action against the United States existed under the civil rights statutes, the United States contends that it cannot be held liable for attorneys' fees.
 
 
 7
 In Maher v. Gagne, 448 U.S. 122, 100 S.Ct. 2570, 65 L.Ed.2d 653 (1980) the Supreme Court held that a plaintiff can receive fees based on section 1988 even though the civil rights claim was never actually adjudicated, where the constitutional claim is substantial and is settled favorably to the plaintiff without adjudication. Id. at 132, 100 S.Ct. at 2576. However, we find that under Kentucky v. Graham, 473 U.S. 159, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) the United States cannot be liable for attorneys' fees pursuant to section 1988 merely because its employees or agents could be liable under section 1988. In that case, the plaintiffs sued under section 1983 seeking damages against various state and local law enforcement officers, a city, and a county. They also sued two government officials in both their individual and official capacities. In addition they sued the Commonwealth of Kentucky, not for damages on the merits, but only for attorneys' fees. The District Court dismissed the action against the Commonwealth, and subsequently the plaintiffs settled the case, preserving the right to seek fees and costs. The plaintiffs then moved under section 1988, asking for attorneys' fees from the Commonwealth.
 
 
 8
 The Supreme Court, in a unanimous decision by Justice Marshall, held that the plaintiffs could not claim attorneys' fees from the Commonwealth under section 1988. Id. at 170, 105 S.Ct. at 3108. The Court noted that the plaintiffs could not have maintained an action against the Commonwealth, nor against the officials in their official capacities, because they were protected by sovereign immunity. Therefore, the plaintiffs were not able to seek attorneys' fees from the Commonwealth: "Where a defendant has not been prevailed against, either because of legal immunity or on the merits, section 1988 does not authorize a fee award against that defendant." Id. at 165, 105 S.Ct. at 3105. The Court added:
 
 
 9
 Indeed, unless a distinct cause of action is asserted against the entity itself, the entity is not even a party to a personal-capacity lawsuit and has no opportunity to present a defense. That a plaintiff has prevailed against one party does not entitle him to fees from another party, let alone from a non-party. Section 1988 simply does not create fee liability where merits liability is nonexistent.
 
 
 10
 Id. at 168, 105 S.Ct. at 3106. The plaintiffs in the present case could not have sued the United States under the civil rights statutes. Furthermore, they did not even allege in their complaint that the United States violated any of the civil rights statutes. Since under Graham fee liability comes only with merits liability, the United States cannot be liable for the plaintiffs' attorneys' fees on the basis of section 1988.
 
 
 11
 The plaintiffs attempt to distinguish Graham in two ways. First, they argue that Graham does not apply because in that case the plaintiffs had only sued the individual defendants in their individual capacities, whereas in the present case, the plaintiffs have sued the individuals in both their individual and their official capacities. However, the plaintiffs are mistaken, the individuals in Graham were also sued in their official capacities. Id. at 161-62, 169, 105 S.Ct. at 3103-04, 3107. Furthermore, the plaintiffs would have been unable to prevail against the individuals in their official capacities because they too would be immune. Clark v. Library of Congress, 750 F.2d 89, 102-04 (D.C.Cir.1984) (sovereign immunity bars suits for money damages against officials in their official capacities absent a specific waiver by the government).
 
 
 12
 Second, they point out that they requested not only monetary relief but also declaratory relief against the individual defendants. It is true that a suit against officials in their official capacities is in reality a suit against the United States, and that sovereign immunity ordinarily does not bar declaratory relief. In this way, then, it is possible that the United States could have been liable under a civil rights theory. However, this case does not present the sort of situation in which Maher found that fees should be awarded, where the constitutional claim is substantial and is settled favorably to the plaintiff without adjudication. First of all, the plaintiffs' claim for declaratory relief was merely pro forma. The District Court never addressed their claim for declaratory relief and the plaintiffs did not press it. Furthermore, the plaintiffs' civil rights claims against the individual defendants were dismissed pursuant to a stipulation. Any claims against the United States under the civil rights laws for declaratory judgment were simultaneously dismissed, and the plaintiffs clearly did not prevail on those claims.
 
 II.
 
 13
 The plaintiffs' second argument is that they are entitled to attorneys' fees under 28 U.S.C. Sec. 2412(b) pursuant to the common law principle that allows the awarding of attorneys' fees against a party who willfully disobeys a court order.
 
 
 14
 The District Court considered this argument under two different common law principles. First, that a court may award fees when "the losing party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons,' " Alyeska Pipeline Co. v. Wilderness Soc'y, 421 U.S. 240, 258-59, 95 S.Ct. 1612, 1622, 44 L.Ed.2d 141 (1975), and second, that fees are appropriate when an opposing party has willfully disobeyed a court order. Id. at 258, 95 S.Ct. at 1622.
 
 A.
 
 15
 As to the first principle, the United States failed to comply with a discovery order to produce specified documents. Instead the government submitted an ex parte letter to the Court signed by the Deputy Attorney General stating that the documents would not be provided to the plaintiffs because the Deputy Attorney General had determined that their release would be "inimical to the public interest." Bergman, 565 F.Supp. at 1362. The plaintiffs argue that the United States' actions in refusing to comply with the order demonstrate bad faith, and consequently it should be liable for attorneys' fees.
 
 
 16
 The District Court reviewed the United States' actions and found that it had acted in good faith in refusing to obey the court's discovery order. 648 F.Supp. at 358. The bad faith exception to the general rule that each party bears its own costs allows attorneys' fees only "in certain exceptional cases." Shimman v. International Union of Operating Eng'rs, Local 18, 744 F.2d 1226, 1229 (6th Cir.1984) (en banc), cert. denied, 469 U.S. 1215, 105 S.Ct. 1191, 84 L.Ed.2d 337 (1985). Because an award of attorneys' fees is extraordinary and punitive, standards for bad faith for purposes of awarding attorneys' fees under the EAJA are stringent. Morley v. Brown, 605 F.Supp. 1468 (N.D.Ohio 1985). The bad faith inquiry turns on the party's subjective bad faith. Sterling Energy Ltd. v. Friendly Nat'l Bank, 744 F.2d 1433, 1435 (10th Cir.1984). A finding as to bad faith is a finding of fact, to be reviewed under the clearly erroneous standard. International Union of Petroleum and Indus. Workers v. Western Indus. Maintenance, Inc., 707 F.2d 425, 428 (9th Cir.1983). The District Court, in determining that the United States had acted in good faith, reviewed the previous events, and its finding is not clearly erroneous. Even if the court's finding as to bad faith were clearly erroneous, it would have been within its discretion to decline to award the plaintiff attorneys' fees. Perichak v. International Union of Elec., Radio, and Mach. Workers, Local 601, 715 F.2d 78, 80 (3d Cir.1983). We do not find an abuse of discretion here.
 
 B.
 
 17
 The District Court also refused to award the plaintiffs attorneys' fees under the common law principle that a court may award fees where the opposing party has disobeyed a court order. The District Court, reviewing the cases that have awarded fees in such situations, noted that "[c]ourts generally have employed this exception, however, to award fees as a sanction when they have cited a disobedient party for civil contempt of court. In this case, the Court never cited the United States for contempt, and thus cannot award plaintiffs their fees and expenses on that ground." 648 F.Supp. at 359 (citations omitted). The plaintiffs argue that the District Court erred because there is no requirement that the party be cited for contempt before becoming liable for attorneys' fees. This is correct; however, the District Court did not say that it was necessary to hold a party in contempt in order to award fees, it is clear from the court's earlier discussion of fees that it understood that fees could be awarded whenever a party has disobeyed a court order. Id. at 358. Rather, the District Court was merely commenting that since it had not held the United States in contempt, the court could not award fees on the basis that it had held it in contempt.
 
 
 18
 The decision whether to award attorneys' fees under this exception was in the discretion of the District Court, Donovan v. Burlington Northern, Inc., 781 F.2d 680, 682-83 (9th Cir.1986), and we hold that the District Court did not abuse its discretion in declining to award fees. As the United States points out, the District Court had previously imposed severe sanctions on the United States for its refusal to comply with the discovery order. 565 F.Supp. at 1373. The order required the production of information that would reveal the identity of confidential informants. The court weighed the government's interest in protecting the safety of informants and continuing the unimpeded flow of information against the plaintiffs' need for the information in order to prove liability.[4] In ordering that the government could not controvert plaintiffs' evidence or proceed with its defense except on statute of limitations grounds, the court enabled the plaintiffs to establish liability. The District Court chose not to impose the permissible additional sanction of attorneys' fees. In determining that this additional penalty was not justified, it did not abuse its discretion.
 
 
 19
 Accordingly, the judgment of the District Court is AFFIRMED.
 
 
 20
 MERRITT, Circuit Judge, dissenting.
 
 
 21
 The majority's bare-bones treatment of the events leading to this appeal obscures the unacceptable behavior of the Department of Justice in the conduct of this litigation. Because the Justice Department clearly acted in bad faith when it openly disobeyed a court order, I would reverse the District Court and award attorneys' fees to the plaintiffs. Not only must federal legal authorities act in good faith in complying with the principle of the rule of law in order to have a just and an effectual legal system, the integrity of the judicial system depends upon it. Our disposition of this case undermines both of these important ideals.
 
 
 22
 The District Court has published four opinions in this case. See Bergman v. United States (Bergman IV ), 648 F.Supp. 351 (W.D.Mich.1986); Bergman v. United States (Bergman III ), 579 F.Supp. 911 (W.D.Mich.1984); Bergman v. United States (Bergman II ), 565 F.Supp. 1353 (W.D.Mich.1983); and Bergman v. United States (Bergman I ), 551 F.Supp. 407 (W.D.Mich.1982). These opinions present a different, far darker, picture of both the events giving rise to this case and of the conduct of the Justice Department during the course of the litigation than that presented by the three-paragraph recitation of facts in the majority opinion. The nature of the government lawyers' actions during this litigation is best seen by placing those actions in their broader context.
 
 I. Facts
 A. The Freedom Rides
 
 23
 The acts upon which this lawsuit is based took place nearly 30 years ago, when buses, restaurants, drinking fountains, and other places in the South were still segregated. The Supreme Court's decision in Boynton v. Virginia, 364 U.S. 454, 81 S.Ct. 182, 5 L.Ed.2d 206 (1960), required the desegregation of public facilities involved in interstate commerce. Members of the Congress for Racial Equality (CORE) decided to see "how far south the law applied." In the spring of 1961, CORE had a plan for "Freedom Riders" to travel through several southern states as a test of the Supreme Court decision. Freedom Riders were black and white citizens who planned to purchase tickets on interstate buses. They challenged segregation by riding in racially mixed groups--rather than riding with white citizens in the front and black citizens in the back--and by seeking services at bus terminals that were segregated.
 
 
 24
 CORE publicized the itinerary of the Freedom Riders. The Federal Bureau of Investigation was aware of the Ride. It had requested its field offices to alert local authorities. The group passed through North and South Carolina, arriving in Atlanta on May 13, 1961. By that point, some violent incidents had occurred, but none on the scale of what was about to take place.
 
 
 25
 On the morning of May 14, 1961, the Freedom Riders left Atlanta. The Riders were on two buses. A Greyhound bus left Atlanta first; a Trailways bus left about an hour later. The original plaintiffs in this case, Walter and Frances Bergman, were on the Trailways bus. The Birmingham field office of the FBI knew that the Freedom Riders had left Atlanta. The FBI informed the Birmingham Police Department of this fact.
 
 
 26
 The Greyhound bus arrived in Anniston, Alabama, and was met by an angry mob. The bus was attacked by the mob and one of its tires was slashed, but it was able to leave Anniston with the aid of a police escort. The police abandoned the escort at the city limits, and soon thereafter the bus was firebombed. The Alabama highway patrolmen at the scene prevented further violence, but they made no effort to arrest anyone or investigate the crimes they witnessed.
 
 
 27
 Shortly after the firebombing of the Greyhound bus, the Trailways bus arrived in Anniston. When the bus parked at the Anniston terminal, the passengers were told of the Greyhound firebombing. Regular white passengers on the bus demanded that the Freedom Riders segregate themselves according to race. They refused. Passengers and others who boarded the bus savagely beat them. Dr. Bergman, who was 61 years old at the time, was beaten and stomped repeatedly about his head, face, shoulders, and back, and was physically thrown over the seats of the bus into the rear. His wife was screaming for the police, imploring the attackers to stop. She tried to come forward to protect him, but was unable to do so. Although law enforcement officers were near the bus, no one tried to prevent the attack. After the beatings were over, a police officer boarded the bus and told the passengers he had seen nothing and could prove nothing.
 
 
 28
 The bus, with the Freedom Riders and many of their attackers still on board, left Anniston. Some of the attackers sat in the front of the bus, brandishing clubs and Coke bottles, and making threatening remarks. Dr. Bergman testified:
 
 
 29
 [W]e did not know what was our destination. We wondered if we would go up some side road where out of sight of the public eye, the people who were riding with us and brandishing those Coke bottles--or colleagues that they might have had a rendezvous with--would attack us and we would receive, ah, serious and perhaps fatal beatings that they were threatening with their constant waving of those Coke bottles.
 
 
 30
 Bergman III, 579 F.Supp. at 933.
 
 
 31
 In Birmingham the bus was met by another mob. The Birmingham police were nowhere in sight. One of the Freedom Riders testified, "You could look maybe 10 or 12 blocks, and all you could see were white angry faces." Id. At the Birmingham bus station, two of the Riders were badly beaten. Dr. Bergman was pushed by the mob, but was able to help another of the beaten Freedom Riders leave the area. After the attacks ended and the mob dispersed, the Birmingham police force reappeared at the scene.
 
 
 32
 The Freedom Riders were unable to find a bus driver in Birmingham who was willing to carry them any further. The next day, a Justice Department representative flew to Birmingham and accompanied the group on a flight to New Orleans.
 
 B. The FBI's Role
 
 33
 For fourteen years, the Bergmans and the other Freedom Riders believed that the Ku Klux Klan and similar racist groups were solely responsible for the beatings that took place in Alabama on Mothers' Day of 1961. In late 1975, however, the Senate Select Committee on Intelligence Practices conducted hearings on the FBI's use of informants in the civil rights movement. One of the informants who testified at these hearings was Gary Rowe. His testimony shed a new light on the role of the FBI in the events of 1961.
 
 
 34
 Rowe testified that he became an informant for the FBI in 1960. At the FBI's direction, he joined the Klan. The FBI learned through Rowe and other informants that the attacks in Anniston and Birmingham were going to take place. Rowe told FBI agents in Birmingham that high-ranking Birmingham police officials were cooperating with the Klan. He told the agents that the Birmingham police had agreed to leave the Birmingham bus station for a fifteen minute period after the arrival of the Freedom Riders, in order that the mob could "beat 'em, bomb 'em, maim 'em, kill 'em," and that there would be no arrests.
 
 
 35
 Rowe testified that his FBI contacts assured him that the violence would not be allowed to occur. Not only did the violence occur, but the government's own informant, Rowe, was one of the Birmingham attackers. Despite all the information the FBI had, it did not inform the Attorney General or the Civil Rights Division of the Department of Justice of the conspiracy of violence until after the May 14 attacks. Upon receiving this information, Attorney General Robert Kennedy and other officials took action to protect the Freedom Riders and to stop further mob violence.
 
 C. This Litigation
 
 36
 Plaintiffs filed this action on January 4, 1977, against several named and unnamed FBI agents, in their individual and official capacities, and the United States government, seeking damages and declaratory relief for alleged violations of their rights arising under the First, Fourth, Fifth, Ninth, Thirteenth, and Fourteenth Amendments to the Constitution, under 42 U.S.C. Secs. 1983, 1985(3), and 1986, and under the Federal Tort Claims Act, 28 U.S.C. Secs. 1346(b) and 2674. The basic thrust of the complaint was that the FBI and its agents had approved the acts of Gary Rowe and likewise participated in and furthered the conspiracy to attack the Freedom Riders in Alabama, and that the defendants breached their duty to prevent or aid in the prevention of the attack upon Walter Bergman--one attack about which the defendants had advance knowledge.
 
 
 37
 Although the plaintiffs alleged violations of their rights under several constitutional and statutory provisions, the only claim that they were ultimately able to try was their cause of action under the Federal Tort Claims Act. This happened through no fault of the plaintiffs, but because the government disobeyed a court order that, if obeyed, would have given the plaintiffs the information they needed to try their entire case. According to District Judge Enslen, the government was a recalcitrant litigant from the outset:
 
 
 38
 Discovery problems have plagued this lawsuit from its inception in 1977. Although Plaintiffs had moved to compel production on several occasions, the Court was not initially required to resolve these motions because, from time to time, the government opted to release some materials. In fact, during a pretrial conference, defense counsel remarked that voluntary disclosure of material by the government to Plaintiffs varied with the year, and that earlier "policy" had been more restrictive than "recent policy." Eventually, however, when agreement could not be reached between counsel, the Court intervened in the discovery disputes and issued production orders.
 
 
 39
 Bergman II, 565 F.Supp. at 1362.
 
 
 40
 The production order that ultimately led to the imposition of sanctions was issued on December 29, 1982. This order directed the government to produce material relating to information obtained from FBI informants and the working papers, notes, and interim records of the task force of the U.S. Department of Justice Office of Professional Responsibility that conducted an inquiry into the conduct of the Civil Rights Division, the FBI, and Gary Rowe. Even though the order contained safeguards designed to protect the identity of informers, the government refused to comply. In an ex parte letter to the District Court dated January 12, 1983, Deputy Attorney General Edward C. Schmults stated, "I have come to the conclusion that compliance with the order under these circumstances would present a serious threat to the ability of federal investigative agencies and their internal inspection units to perform their critically important function." App. 37. Schmults went on to state, "I cannot conclude that the administration of justice requires disclosure; in fact, I must conclude to the contrary, that the administration of justice requires that the material not be disclosed." App. 40.
 
 
 41
 District Judge Enslen, while noting that "the tone of the letter ... seemed to confuse the role of the executive branch with that of the judicial," Bergman II, 565 F.Supp. at 1362, attempted to accommodate the government's concerns by appointing a magistrate to review the documents in camera. On February 11, 1983, the magistrate submitted a Report and Proposed Findings of Fact. The District Court adopted the report and proposed findings on February 16. The magistrate's review concluded that additional document production was necessary, so the District Court ordered further in camera inspection.
 
 
 42
 On February 28, 1983, while the in camera inspection proceeded, the trial began. Early in the trial, the District Court came to the conclusion that the in camera procedures suggested by the Deputy Attorney General were unjust. The Court concluded that due to the complex nature of the legal and factual issues involved and the sheer bulk of the documents, no in camera review by the Court or a magistrate could adequately serve the needs of the plaintiffs. Id. at 1363. Additionally, the District Court concluded that the in camera procedures were unjust because the plaintiffs would be unable to participate in the factfinding process. The plaintiffs would have no opportunity to propose findings of their own or to challenge the Court's findings because they would not have access to the documents. Id. Finally, the Court noted that the government lawyers "added condition upon condition to their proposals, eventually rendering worthless any in camera procedure leading to fact findings." Id.
 
 
 43
 On March 3, 1983, the District Court therefore ordered the Justice Department to produce the documents in question. The Court considered the government lawyers' assertion of a limited privilege not to disclose the identity of confidential informants, but decided that the interest of the plaintiffs in a full and fair determination of their cause outweighed the interests of the Justice Department in protecting the safety of its informers and in continuing the unimpeded flow of information. A major reason for the decision was the refusal of the government lawyers to disclose to the Court whether any informant was still alive, because the death of an informant dissolves the limited privilege. See Roviaro v. United States, 353 U.S. 53, 60 n. 8, 77 S.Ct. 623, 627 n. 8, 1 L.Ed.2d 639 (1957). The District Court did, however, require that the disclosure be made to plaintiffs' counsel in chambers under a protective order which would require that counsel not disclose the information to anyone, including their clients, and that they use the information only for the purposes of the lawsuit. Bergman II, 565 F.Supp. at 1358-62.
 
 
 44
 The government lawyers informed the District Court that they would comply with the order only if the protective order also required plaintiffs' counsel to waive any further investigation or their right to other documentation which might be prompted by the documents they were allowed to examine. The District Court again tried to accommodate the Justice Department. The Court stated that it would entertain further motions to compel production, but that further investigation or review would not be permitted unless the plaintiffs overcame an "overwhelming and substantial burden" of showing need. Id. at 1369.
 
 
 45
 The Department of Justice flatly refused to comply with this order. At this point, the District Court felt it had no alternative but to impose sanctions. The District Court held that the government's defense on the merits of the liability issue would not be allowed to proceed. The only defense the government lawyers were allowed to assert during the liability phase of the trial was the statute of limitations.
 
 
 46
 The Department of Justice had a twofold response to this order. First, it made a motion for reconsideration. Second, it issued a press release defending its disobedience of the Court's order. The motion for reconsideration was denied on May 24, 1983.
 
 
 47
 On May 28, the District Court issued its opinion on liability. Bergman II, 565 F.Supp. at 1375-1416. The opinion addressed only the plaintiffs' Federal Tort Claims Act cause of action against the government. The District Court found that the government was liable to the plaintiffs under three theories: negligence per se under Alabama law as a result of its agents' violation of Sec. 1986; negligence per se as a result of the FBI's breach of its duty "to detect and prosecute crimes against the United States," 28 U.S.C. Sec. 533; and negligent performance of the government's voluntary undertaking to protect the Freedom Riders.
 
 
 48
 The damages portion of the trial was then held. By stipulation, the unknown individual FBI defendants were dismissed. The District Court issued its opinion on damages on February 7, 1984. Bergman III, 579 F.Supp. 911. On November 14, 1984, pursuant to a stipulation, the District Court entered final judgment for the plaintiffs against the United States and dismissed with prejudice the plaintiffs' claims against the two named individual FBI defendants.
 
 
 49
 The plaintiffs then moved for attorneys' fees. Their motion was denied on November 17, 1986. This appeal followed.
 
 
 50
 II. The Government's Liability for Attorneys' Fees
 
 
 51
 The Equal Access to Justice Act makes the United States liable for attorneys' fees and expenses "to the same extent that any other party would be liable under the common law." 28 U.S.C. Sec. 2412(b). Although attorneys' fees are generally recoverable by prevailing parties in English common law courts, see Goodhart, Costs, 38 Yale L.J. 849, 849-72 (1929), the circumstances under which recovery of fees is permitted in American courts are much more narrow, see id. at 872-78. See also Alyeska Pipeline Service Co. v. Wilderness Society, 421 U.S. 240, 247-62, 95 S.Ct. 1612, 1616-24, 44 L.Ed.2d 141 (1975). Under the "American Rule," attorneys' fees "are not ordinarily recoverable in the absence of a statute or enforceable contract providing therefor." Fleischmann Distilling Corp. v. Maier Brewing Co., 386 U.S. 714, 717, 87 S.Ct. 1404, 1406, 18 L.Ed.2d 475 (1967).
 
 
 52
 The Supreme Court recognizes some exceptions to the general rule. Courts have inherent equitable power to award attorneys' fees in some situations. Alyeska Pipeline, 421 U.S. at 259, 95 S.Ct. at 1622.
 
 
 53
 Indeed, the power to award such fees is "part of the original authority of the chancellor to do equity in a particular situation," Sprague v. Ticonic National Bank, 307 U.S. 161, 166 [59 S.Ct. 777, 780, 83 L.Ed. 1184] (1939), and federal courts do not hesitate to exercise this inherent equitable power whenever overriding considerations indicate the need for such a recovery." Mills v. Electric Auto-Lite Co., 396 U.S. 375, 391-92 [90 S.Ct. 616, 625, 24 L.Ed.2d 593] (1970); see Fleischmann Distilling Corp. v. Maier Brewing Co., 386 U.S. 714, 718 [87 S.Ct. 1404, 1407, 18 L.Ed.2d 475] (1967).
 
 
 54
 Hall v. Cole, 412 U.S. 1, 5, 93 S.Ct. 1943, 1946, 36 L.Ed.2d 702 (1973). Among the exceptions to the American Rule are situations in which the losing party has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons," Alyeska Pipeline, 421 U.S. at 258-59, 95 S.Ct. at 1622 (quoting F.D. Rich Co. v. Industrial Lumber Co., 417 U.S. 116, 129, 94 S.Ct. 2157, 2165, 40 L.Ed.2d 703 (1974)), and when a party has willfully disobeyed a court order, Alyeska Pipeline, 421 U.S. at 258, 95 S.Ct. at 1622.
 
 
 55
 The government's conduct in this case falls within both of these common law exceptions to the American Rule. The District Court's factual determination that the government did not act in bad faith is clearly erroneous. Furthermore, the majority is only able to affirm the District Court's decision on the disobedience of a court order exception by a fundamental misreading of the lower court's opinion.
 
 A. The Bad Faith Exception
 
 56
 After reviewing the District Court's account of the disobedient conduct of government counsel during the liability phase of the trial, I do not understand how the District Court could conclude that the government did not act in bad faith. Therefore, I would hold that this finding is clearly erroneous. The actions of the Justice Department in this case evidence a fundamental disrespect for the rule of law. The Department of Justice must also abide by the law, whether it agrees with the law or not.
 
 
 57
 In objecting to the disclosure of the documents in question, government counsel purported to rely on the limited informant's privilege, which exists to protect the public interest and the free flow of information to law enforcement officials. See Roviaro v. United States, 353 U.S. at 59-60, 77 S.Ct. at 627. The privilege is limited by the fundamental requirements of fairness. "Where the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way." Id. at 60-61, 77 S.Ct. at 628. In relying on the privilege, however, the government lawyers showed absolutely no concern for these fundamental requirements of fairness or for the role of the District Court in making the fairness inquiry. Instead, the government acted in a fashion that thwarted the Court's legitimate inquiry into whether the privilege applied:
 
 
 58
 When the Court attempted to follow the government's suggestions for in camera inspection, the government effectively prevented the fact finding process by first requesting that the Court make the findings only in Chambers and under seal, and then, by proposing that the facts be disclosed outside of the presence of Plaintiffs or Plaintiffs' counsel. These proposals were made by Defendant's trial counsel, who confidently predicted that if the Court followed this ex parte procedure, no facts would ever be disclosed, since the government argued that it would be able to convince the Court that any fact finding would be prejudicial to some informant, somewhere. Yet, perversely, the government refused to disclose to the Court or counsel whether any informant still lived, the death of the informant effectively extinguishing the very limited informant "privilege." ... The government never supplied the Court with the condition precedent for invoking such a "privilege," that is, evidence of a single live informant.
 
 
 59
 Bergman II, 565 F.Supp. at 1365 (emphasis in original).
 
 
 60
 In the face of such recalcitrance, the District Court nevertheless repeatedly sought to accommodate the Justice Department's shifting demands for discovery limits. Finally, because government counsel gave the District Court nothing against which to balance the plaintiffs' need for disclosure, the District Court had no choice but to resolve the informant's privilege question against the government. Yet, when the District Court issued its order, the Justice Department, protesting that the Court had not considered all the appropriate elements in the balancing process, refused to comply. As the District Court noted, the Justice Department "not only argued the propriety of its refusal to disclose, but also wants to sit in judgment upon that refusal, thus ignoring the cornerstone of our system of government, the separation of powers." Id. at 1367.
 
 
 61
 The government lawyers might not have been acting in bad faith when they first asserted the informant's privilege. Conceivably, they might not have been acting in bad faith when they did not provide the District Court with the information whether any of the informants were still alive, and when they repeatedly modified the conditions under which they said the documents could be disclosed. But the government lawyers were obviously acting in bad faith when even after the District Court repeatedly attempted to accommodate their requests, they flatly refused to obey the Court's order.
 
 
 62
 The District Court did not explain why it did not find that the Justice Department had acted in bad faith. I assume that the District Judge must have thought that government counsel sincerely believed that release of any information at all would jeopardize informants. Even if it is true that these assertions were sincere, the District Court erred in allowing a litigant's belief that a court order was wrong to elevate disobedience of that order to the level of good faith. The authority of the judiciary rests on respect for the rule of law. When a litigant does not agree with a judicial order, the order should be appealed. The Justice Department never sought review. Instead, the Department of Justice simply disobeyed the order and issued a press release. I find this behavior in bad faith. I would hold that the District Court's finding that the Justice Department acted in good faith was clearly erroneous.
 
 
 63
 B. The Exception for Willful Disobedience of a Court Order
 
 
 64
 Even absent a finding of bad faith, the District Court should have awarded fees to the plaintiffs. Here, the District Court erred on a question of law. The District Court held that it could not award fees under the disobedience of a court order exception to the American Rule because it did not hold the government in contempt.
 
 
 65
 The District Court's discussion of this common law exception took place in a single paragraph:
 
 
 66
 The second exception appears at first glance to apply here. Courts generally have employed this exception, however, to award fees as a sanction when they have cited a disobedient party for civil contempt of court. [citations omitted] In this case, the Court never cited the United States for contempt, and thus cannot award plaintiffs their fees and expenses on that ground.
 
 
 67
 Bergman IV, 648 F.Supp. at 359. As the majority correctly notes, there is no requirement that a party be cited for contempt before becoming liable for attorneys' fees. The majority sidesteps the District Court's error, however, by adopting a strained reading of the lower court opinion. The majority asserts that in the passage quoted above,
 
 
 68
 the District Court was merely commenting that since it had not held the United States in contempt, the court could not award fees on the basis that it had held them in contempt.
 
 
 69
 The majority's reading of the District Court opinion is wrong for two reasons. First, the District Court's discussion of the disobedience of a court order exception begins and ends with the discussion of contempt. Taken in context, the sentence relied on by the majority means exactly what it appears to mean--the District Court did not think it had discretion to award fees under this exception unless it had cited the government for contempt. This conclusion is buttressed not only by the quoted paragraph, but by the language used by the District Court when it announced its conclusions on the common law exceptions to the American Rule. Bergman IV, 648 F.Supp. at 358-59. It is clear that the District Court felt that it could not exercise its discretion to award fees because it did not think that this case fit either common law exception.
 
 
 70
 The Court believes that neither exception applies here.... [T]he Court ... cannot award plaintiffs their fees.... [T]he plaintiffs are not entitled to an award of attorneys' fees....
 
 
 71
 Id. at 358-59 (emphasis added). These are hardly terms signifying the exercise of discretion.
 
 
 72
 The second reason the majority's reading of this portion of the lower court opinion is wrong is that it would be nonsensical for the District Court to make the apparently repetitive statement that the majority says it made. The majority reads the District Court's phrase "that ground" to refer to an award of fees for disobedience of a court order when a party has been cited for contempt. The majority thus believes that the implicit holding of the District Court is that it had discretion to award attorneys' fees under the disobedience of a court order exception regardless of whether it held the government in contempt, but that it declined to exercise that discretion. The majority does not explain why the lower court discussed the disobedience of a court order exception only in the context of civil contempt and said nothing about the possibility of awarding fees without a contempt citation. It is clear that the District Court was under the mistaken impression that it could only award attorneys' fees under the disobedience of a court order exception if it had cited the government for contempt.
 
 
 73
 The reason the District Court chose not to cite the government attorneys for contempt was that it believed that doing so would "simply serve to create a public spectacle pitting the Court and the Justice Department on opposite sides of the controversy ... while not aiding the causes here joined," and because it knew that "such an order of incarceration or fine would not shed any light whatsoever upon the hidden documents." Bergman II, 565 F.Supp. at 1371. The imposition of sanctions by the District Court was an attempt to give the plaintiffs something resembling a fair trial even in the face of continued flagrant disobedience of the Court's order by the defendant. The District Court assumed that the choice of sanctions it made early in the case foreclosed it from imposing an award of attorneys' fees at the end of the proceedings, and this assumption was incorrect.
 
 III. Conclusion
 
 74
 The Civil Rights Act of 1871 was an attempt to end the Ku Klux Klan's reign of terror in the South. Ninety years after the passage of the Act, Klan members in Alabama savagely beat Walter Bergman. The mob was purposely unrestrained by local law enforcement authorities, and the FBI offered no protection or intervention despite advance knowledge of the conspiracy of violence.
 
 
 75
 When the plaintiffs learned that the FBI could have taken action to prevent the May 1961 attack, they sought to vindicate the rights they were granted by the Constitution and the Civil Rights Act. Although the government and the majority correctly note that the plaintiffs cannot recover attorneys' fees under Sec. 1988 because they stipulated to a dismissal of their Civil Rights Act claims, we should not lose sight of the reason the plaintiffs had to agree to the stipulation--in defiance of a court order, the Justice Department flatly refused to give them access to the information they needed to try their case. The plaintiffs therefore were simply unable to maintain their civil rights action. The judicial system has yet to impose sanctions against government counsel for their contumacious conduct.
 
 
 76
 The civil rights movement has been predicated on respect for the rule of law. It is ironic and distressing that in this civil rights case the Department of Justice has acted in a manner that evidences total disregard of that principle. One week after the beatings that gave rise to this lawsuit, Martin Luther King, Jr. spoke of the federal government's special responsibility to protect civil rights:
 
 
 77
 Among the many sobering lessons that we can learn from the events of the past week is that the Deep South will not impose limits upon itself. The limits must be imposed from without. Unless the federal government acts forthrightly in the South to assure every citizen his constitutional rights, we will be plunged into a dark abyss of chaos.
 
 
 78
 Quoted in Garrow, Bearing the Cross: Martin Luther King, Jr., and the Southern Christian Leadership Conference 157 (1986). In many later instances, of course, the Department of Justice and the FBI did act forthrightly to assure the constitutional rights of citizens. In May 1961, however, it appears that the FBI shirked its duty. The conduct of the Department of Justice in this litigation has both perpetuated that failure and covered it up. To this day, even in the face of a court order, the government will not release the evidence that will let the truth come out. The Department of Justice should be held accountable for its disrespect for the law; that is the reason for the common law exceptions to the American rule against attorneys' fees awards.
 
 
 
 [1]
 James T. Drummond is the personal representative of the estate of Frances Bergman, deceased, who was plaintiff Walter Bergman's wife
 
 
 [2]
 We note that such an order has been held not to be an appealable collateral order. In re United States (Peck v. United States), 680 F.2d 9, 11-12 (2d Cir.1982); In re United States, 565 F.2d 19, 23 (2d Cir.1977), cert. denied, 436 U.S. 962, 98 S.Ct. 3082, 57 L.Ed.2d 1129 (1978)
 
 
 [3]
 42 U.S.C. Sec. 1988 provides in pertinent part that "[i]n any action or proceeding to enforce a provision of sections 1981, 1982, 1983, and 1986 of this title, ... the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fees as part of the costs."
 
 
 [4]
 We cannot agree with the dissent that the government does not have any interest in protecting an informant's identity once he dies. Rather informants and potential informants may be justifiably concerned that disclosure of an informant's identity after his death could jeopardize his family's safety and his reputation, for our society does not regard informants fondly:
 American society has always approved those who own up to their wrongdoing and vow to do better, just as it has admired those who come to the aid of the victims of criminal conduct. But our admiration of those who inform on others has never been as unambiguous as the majority suggests. The countervailing social values of loyalty and personal privacy have prevented us from imposing on the citizenry at large a duty to join in the business of crime detection. If the Court's view of social mores were accurate, it would be hard to understand how terms such as "stool pigeon," "snitch," "squealer," and "tattletale" have come to be the common description of those who engage in such behavior.
 Roberts v. United States, 445 U.S. 552, 570-71, 100 S.Ct. 1358, 1369, 63 L.Ed.2d 622 (1980) (Marshall, J., dissenting).